

**SIGNED this 29th day of July, 2013**

_Shelley D. Rucker_
_____
Shelley D. Rucker
**UNITED STATES BANKRUPTCY JUDGE**

_____

(Not for publication. Case has limited precedential value.)

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF TENNESSEE
## SOUTHERN DIVISION

In re:

                                    No.   11-10585
                                     Chapter 7

DRAGAN NMN LAZAREVIC,

       Debtor;

ZIVORAD ADAMOVIC, as next friend and as
parent of ALEX ADAMOVIC and
FILLIP ADAMOVIC, minors,

       Plaintiff

v.

                                      Adversary Proceeding
                                      No.   11-1048

DRAGAN LAZAREVIC,

       Defendant

1

Appearances for the Plaintiff,
  James L. Henry
  412 Broad Street, Chattanooga, Tennessee
  David L. Moss
  1200 Mountain Creek Road, Suite 260, Chattanooga, Tennessee

Appearances for the Defendant/Debtor
  Harry Miller
  6918 Shallowford Road, Suite 100, Chattanooga, Tennessee

## MEMORANDUM

The plaintiff Zivorad Adamovic ("Plaintiff" or "Zeke"), as next friend and as natural parent of Alex Adamovic and Fillip Adamovic, minors ("Minors") objects to the dischargeability of certain debts which the Plaintiff contends are owed to the Minors by the defendant debtor, Dragan NMN Lazarevic ("Debtor" or "Defendant"), pursuant to 11 U.S.C. §§ 523(a)(2)(A), (4) and (6). The Debtor is the Minors' uncle. The Minors are seeking a monetary judgment for the value of the property which they contend was taken from them by the Debtor, punitive damages and attorneys' fees. In addition, they object to the Debtor's discharge pursuant to 11 U.S.C. §§ 727(a)(2)(A), (3), (4) and (5).

At the center of this dispute between the Minors and their uncle, the Debtor, is the untimely death of their mother Slobodanka ("Danka") Lazarevic Adamovic from brain cancer in June 2006. In this case, the Minors allege that their mother's wish, as she expressed it to them, was that her assets be preserved for their benefit. They contend that the transfers that the Debtor claims she made to him in the days before her death were for their benefit and those assets were imposed with a trust at that time. The Debtor contends that his sister gave him her assets in gratitude for his past financial help and to relieve the Minors of the financial burden of paying a

mortgage. As written proof of her wishes, Danka Lazarevic left only one transfer document, executed under unusual circumstances, during her last few days of life. She left no will and no written trust agreement providing this court with written evidence of her intentions. The court is left to sift through the conflicting testimony interpreting a quitclaim deed (the one written document that is available) along with the hospice records regarding Danka's medical condition at the time of the transfers of her property, and the statements made by Danka in anticipation of her death, to discern whether she imposed trust obligations on the property she transferred. As part of its analysis, the court will have to determine what property rights the Debtor had and what property rights the Minors had at the time of her death. To the extent that the Minors had rights in the property as her heirs, the court will look to see whether the Minor's rights were disregarded by the Debtor in such a way that the Debtor has monetary obligations to the Minors, and, finally, whether those obligations are nondischargeable.

The court must also review whether these transactions between the Debtor and his sister are too remote from his bankruptcy filing to be considered transactions that might also support objections to the Debtor's discharge. If they are not, then the court will also consider whether the assets which the Debtor contends he obtained on account of his sister's gratitude have been accounted for in the Debtor's records and whether the Debtor has satisfactorily explained the disposition of the proceeds of those assets. To the extent that the Debtor still has possession of his sister's assets, they are the subject of a decedent's estate administration pending in the Chancery Court of Hamilton County, Tennessee, that the Debtor contends prevents him from delivering those assets to the Minors at this time.

Finally, the Minors have also raised another basis for denial of the Debtor's discharge.

3

The Minors have produced evidence that the Debtor was engaged in a real estate business and that he transacted a substantial amount of real estate business with an individual, David Collins, during the six year period prior to his filing this bankruptcy case. The Minors contend the Debtor and Mr. Collins were partners, but there is no reference to this business or partnership in the Debtor's schedules or statement of affairs. The Debtor denies that he was ever in a partnership or that he failed to disclose any partnership interests. The Minors object to the Debtor's discharge on the basis that he made false oaths regarding this partnership interest.

The court has considered the pleadings filed in this adversary proceeding, the testimony and exhibits presented at the three day trial, the arguments of counsel and the applicable case and statutory authorities cited by the parties in their briefs. For the reasons stated below, the court finds that the Minors are entitled to a nondischargeable judgment in the amount of $51,075 under 11 U.S.C. § 532(a)(6). The court also denies the Debtor's discharge under 11 U.S.C. § 727(a)(4) on the basis that he made false oaths in his schedules and statement of financial affairs ("SOFA"). The court denies the Plaintiff's request for attorneys' fees and punitive damages. The court bases the foregoing rulings on the following findings of fact and conclusions of law made in accordance with Fed. R. Bankr. P. 7052.

## I.   Issues

With respect to the objections based on 11 U.S.C. § 523, the court will address the following issues:

A.   Did the Debtor obtain property from his sister Danka by fraud or false pretenses?

B.   Did the Debtor take title to Danka's residence in trust and fail to use or preserve that property for the Minors' benefit?

4

C.       Did Danka convey any other personal property to her brother prior to her death?

D.       To the extent that Danka still owned property at her death, did the Debtor

willfully and maliciously convert that property to his own use in violation of the Minors' rights

in the property?

With respect to the objections based on 11 U.S.C. § 727, the court will address the

following issues:

A.       Did the Debtor make transfers of his property with the intent to hinder, delay or

defraud his creditors within one year prior to the filing?

B.       Did the Debtor make a false oath in his SOFA regarding his real estate business?

C.       Did the Debtor fail to keep records from which his financial condition could

reasonably be ascertained?

D.       Did the Debtor own assets, the loss or disposition of which he failed to explain

satisfactorily?

**II.       Jurisdiction**

The court has jurisdiction pursuant to 28 U.S.C. § 1334 and §§ 157(b)(2)(I) and (J).

These are core matters regarding the discharge of the Debtor and the dischargeability of the debts

owed to the Minors.

**III.      Facts**

The Debtor filed his Chapter 7 voluntary bankruptcy petition on February 4, 2011.

[Bankr. Case No. 11-10585, Doc. No. 1]. The Plaintiff, representing the Minors, filed this

adversary proceeding on April 27, 2011. [Doc. No. 1, Complaint].[1]

---

1  All docket entry references refer to docket entries pertaining to Adversary Proceeding No.

### A.      State Court Litigation Instituted Before Filing

At the time of the filing of his bankruptcy petition, the Debtor was a defendant in a

Tennessee state court case filed by the Plaintiff in Hamilton County Circuit Court alleging fraud,

conspiracy, deceit, undue influence, breach of fiduciary duty and breach of trust ("Tennessee

Lawsuit"). The Complaint alleges that the Debtor wrongfully acquired and converted most of the

assets and personal property belonging to his sister, Danka, to the detriment of the Minors.

### B.      Family Background

The Debtor is a native of Serbia who immigrated with his parents to the United States as

a child. His sisters Danka and Grozdana Lazarevic ("Donna") came later to the United States.

They had been left behind with relatives and were educated in Serbia. Testimony of Dragan

Lazarevic ("D. Lazarevic Test."), November 7, 2012. The Debtor was educated in Serbia through

5th grade and completed high school at Queen's Vocational in New York where he studied

plumbing, although he testified that he never obtained a license. *Id.* After the death of his father,

the Debtor assumed the role of the head of the family.

Danka met and married Zivorad "Zeke" Adamovic in Serbia. They immigrated to the

United States in 1984. From the evidence presented at trial, the Debtor, Danka and Donna and

their spouses and children were a close family and frequently lived with one another while

seeking to establish themselves in this country. *Id.* Specifically, Danka and her husband lived

with Donna and her husband for four months and then Danka later reciprocated and had her

sister live with her and Zeke for several years. D. Lazarevic Test., November 7, 2012; Testimony

of Donna Lazarevic ("Do. Lazarevic Test."), November 7, 2012. Danka and Zeke had two

---

11-1048, unless otherwise noted.

children, the Minors in this case. The parties stipulated that Danka loved her sons more than anything in the world. At the time of her death in 2006, Alex was 11 and Fillip was 6. The Minors are now 18 and 13. Testimony of Zivorad Adamovic ("Z. Adamovic Test."), November 6, 2012. The court finds that in this mix of family relationships, the Debtor exerted significant influence over the extended family. Both sisters deferred to him, and he was expected to handle the problems of the extended family from finances to unruly spouses. Do. Lazarevic Test., Nov. 6, 2011.

### C.      Danka's Financial Condition

In 2003 Danka and Zeke had marital problems which resulted in a divorce in 2004. Zeke mentioned his strained relationship with the Debtor and his wife's divided loyalties as one of the conflicts that impacted their marriage. Trial Ex. Q at 38. Danka had worked as a nursery school teacher at a salary of $16 -18 an hour. Danka had also worked as a property manager at approximately the same salary, although the timing of this employment is unclear. Trial Ex. 73, Deposition of Dragan Lazarevic ("D. Lazarevic Dep.") at 30-31. The court estimates her annual salary was approximately $36,000 a year. She also received child support of $550 a month from Zeke. Z. Adamovic Test., November 6, 2012. In the divorce property settlement, she received two properties which provided about $33,000 in equity and cash of $10,000. Z. Adamovic Test., November 6, 2012. The couple owned a third property, a duplex, which they agreed would continue to be held jointly and treated as trust property for their children, the Minors. Z. Adamovic Test., November 6, 2012. Trial Ex. 78 at 3. Danka managed the duplex until she became sick, and then Zeke maintained the duplex. Z. Adamovic Test., November 6, 2012.

D.       **Danka's Physical Condition**

Danka was diagnosed with brain cancer in January of 2005. She had brain surgery but the symptoms returned in December of 2005. Z. Adamovic Test., November 6, 2012. During 2005, she took her children on a cruise. She traveled to Austria for medical treatments for three weeks. Z. Adamovic Test., November 6, 2012; D. Lazarevic Test., November 7, 2012. In April of 2006, she confirmed that the cancer had returned. As a result of her illness, she stopped working in April of 2006. Z. Adamovic Test., November 6, 2012. Her health continued to deteriorate. Despite various treatments of radiation and chemotherapy, she was told on June 22, 2006 by her physician that nothing more could be done. Hospice was ordered for her on that day. At that time, the medical reports indicated that she was having trouble walking without assistance and was losing sight in one eye. D. Lazarevic Test., November 7, 2012. Do. Lazarevic Test., November 7, 2012; Testimony of Diane Case ("Case Test."), November 6, 2012; Trial Ex. 75, Hospice of Chattanooga Records ("Hospice Records"), Progress Notes, pp. 6-7.

On June 22, 2006, the hospice organization did its initial assessment and brought medical equipment to her home. Danka was able to participate in discussions with her hospice worker, and she executed her medical forms. Four days later on June 26, a second assessment was made, and her pain medication was doubled. On this date, the Debtor, not Danka, signed her end of life directions. Case Test., November 6, 2012. The Debtor testified at his deposition that Danka was not competent to sign the documents on June 26 for hospice. Trial Ex. 73, D. Lazarevic Dep. at 44-45; *see also* Case Test., November 6, 2012. Hospice records show that Danka was hallucinating and making demands which indicated she was no longer accurately perceiving her own physical condition. Trial Ex. 75, Hospice Records, Progress Notes, p. 11.

8

E.      **Danka's Property**

On June 21, 2006, the day before Hospice's arrival, Danka owned a home located at 1901

Payne Road (the "Residence"), which she shared with her two children and a male companion,

the furnishings in that home, an account in a 401(k) plan with Winn Management of

approximately $1,400.00 (Trial Ex. 16), an individual retirement account ("IRA") containing

$7711.73 at SunTrust Bank, a checking account at SunTrust Bank, a checking account at

Volunteer Bank, a Hyundai Sonata automobile, and other personal assets including a jewelry

collection. She died intestate on June 30, nine days later. By that date, she had made the Debtor a

joint tenant with right of survivorship to her Residence. Her sister Donna now claims she had

been given the Sonata. The Debtor closed and deposited the funds from the SunTrust IRA and

bank account into his own account.

Within a year of her death, the Residence had been sold to David Collins, a business

associate of the Debtor's, for a gain of between $57,000 and $80,000, depending on which

version of the contract terms one believes. The proceeds were taken by the Debtor. The Sonata

was sold for $2400, although the date is unclear. The Debtor deposited the Sonata proceeds into

his account or used them for himself and his family. The Debtor closed Danka's Volunteer Bank

account by forging his deceased sister's signature on the check. He then retained the $600

proceeds for his personal use. The Debtor took possession of Danka's household furnishings,

except for personal clothing, toys, and bedroom furnishings obtained by the Minors shortly after

their mother's death. He either sold, threw away, or incorporated all of the remaining furnishings

into his own home. The Debtor took possession of his sister's jewelry, but denies that any of the

pieces have been removed from the collection. He testified that he is holding this collection for

the Minors but has refused to turn over the pieces to them citing his obligations to the administration of her estate that he did not instigate until 2010. It is unclear whether the Winn 401(k) was transferred at some later date to the Debtor. D. Lazarevic Test., November 6, 2012;Trial Ex. 16. (Winn 401(k), 12/31/2009 Account Statement).

Danka's only heirs are her two minor sons, the Minors. Tenn. Code Ann. § 31-2-104(b)(1).

The court will discuss the facts relevant to each item of property separately.

*1. The 1901 Payne Road Residence*

*(a) Acquisition*

The Residence on 1901 Payne Road was part of a family compound. The Residence was located adjacent to the Debtor's and his sister Donna's homes. Z. Adamovic Test., November 6, 2012; Trial Ex. M. Danka purchased the Residence at 1901 Payne Road on November 25, 2003. The purchase price was $199,900.00. Trial Exs. 12, 13. Danka financed $189,900 of the purchase price. Trial Ex. 12. The mortgage payments were $1600 a month. She insured the house for $212,000 at closing. Trial Ex. 14.

The parties dispute the sources of the down payment and the closing costs. Danka is listed as the only purchaser of the home, and only Danka's name appears on the check for closing costs. Trial Ex. 13. However, the Debtor testified that he provided Danka with $1,000 for earnest money for the Residence and with $11,000 of the $15,973.45 in closing costs. He also testified that he has no records to prove he supplied those funds. D. Lazarevic Test., November 6, 2012.

Zeke testified that he believed that his ex-wife used her own money. He contends the

source of funds was from their divorce settlement and the money she received from the sale of

their previous residence. While there had been some equity in the residence when she received it

in the divorce settlement, she placed a second mortgage on that property in 2005. Trial Ex. O.

When the prior residence was sold, the warranty deed indicates that there were no proceeds paid

to Danka from that sale. Trial Exs. N-P. Z. Adamovic Test., November 6, 2012. Based on

evidence presented at trial indicating the Debtor's and Danka's income, the court finds that the

Debtor's testimony that he provided financial assistance to his sister is credible, although the

exact amount is unclear.

*(b) Danka's First Attempt to Transfer the Residence*

Danka was diagnosed with the brain tumor not long after moving into the Residence.

Following that diagnosis, she was trying various medical treatments and traveling. The Debtor

and Donna testified that Danka was concerned about her mortgage obligations and tried to

convey her home to her brother in 2005. D. Lazarevic Test., November 7, 2012. Do. Lazarevic

Test., November 7, 2012. The Debtor testified that in 2005 Danka had a quitclaim deed drafted

to convey to him the Residence so that she would not have to worry about the burden of the

house. She delivered the deed to him, but "a month or so after" he tore it up because he thought

that she was giving up on her life. D. Lazarevic Test., November 7, 2012; Trial Ex. 73, D.

Lazarevic Dep., pp. 24-25.

The Minors question the credibility of the Debtor's contention that Danka tried to give

the house away in 2005. Neither Zeke nor Alex testified that they had any knowledge of an

attempt by Danka to give the Debtor her Residence in 2005. At trial, they called the manager of

Warranty Title Company, Patty Martin, who testified that Warranty Title had no file or record of

11

an account for Danka and nothing in their electronic records indicated that a quitclaim deed had

ever been prepared in 2005 or at any later date. Testimony of Patty Martin ("Martin Test."),

November 8, 2012. Whether a deed was actually prepared in 2005 is not determinative to the

court's consideration of the issues before it. The 2005 quitclaim deed was never accepted by the

Debtor nor recorded. Danka continued to live in the house with her children and treated the

Residence as hers.

> *(c) Danka's Attempt to have Zeke take control of the house*

Like the Debtor, Zeke also has a story of Danka's trying to get him to take the Residence

before her death. Zeke testified that during the last weeks of her life, Danka asked him to move

back into the house and raise their children there. Z. Adamovic Test., November 6, 2012. He had

remarried and believed that it would not be fair to his current wife to move into his former wife's

home. *Id*. at 30. He also testified that Donna had previously asked him if it was okay for the

family to approach Danka to sign over the house to the Debtor so the children could have

something when she dies instead of the house going into foreclosure. Z. Adamovic Test.,

November 6, 2012. Zeke admitted that Danka told him that she had put the house in her brother's

name and he described what Danka told him the arrangement was.

> Q:    Now after – we're talking about during this two-week period but prior to June
> 22nd, when Hospice came. After she had – after you had told her that you would not
> promise to move into her house, what did she say to you about her plans for doing with
> the house?
> A:    She realized I wasn't willing to move in the house, to stay in her house.
> She told me she had signed over the house over to her brother so the children
> could have the house – either the house or if he decides to sell the house and
> everything came with the house to be invested for the future of the children.
> That's what she told me. That's what she told children.

Z. Adamovic Test., November 6, 2012.

Just as Zeke finds the Debtor's testimony about an earlier attempt to transfer the Residence unbelieveable, the Debtor and his surviving sister Donna both deny that Danka ever discussed the preservation of the Residence for her children with the Debtor. Donna even denies she ever had the conversation with Zeke about approaching Danka about transferring the Residence. Do. Lazarevic Test., November 7, 2012. Whichever version actually occurred, it is undisputed that Danka did convey a joint interest in her Residence to her brother and that Zeke admits he was told that the transfer had occurred two weeks before her death. Z. Adamovic Test., November 6, 2012.

### (d) Danka's Joint Tenancy Transfer to Debtor

On the morning of June 22, 2006 Danka, Donna and Dragan went to see Dr. Arrowsmith for the last time as there was nothing else for him to do for Danka. D. Lazarevic Test., November 7, 2012. Do. Lazarevic Test., November 7, 2012. Immediately following the appointment with Dr. Arrowsmith, Donna and the Debtor testified that Danka began talking about going to Texas for further treatments and her intention to get healthy. The Debtor testified that his sister asked him to "just take over the house, please." At this point, the Debtor testified that he looked at his other sister, Donna, and had to admit to Danka that he had torn up the 2005 quitclaim deed. At this point, Danka became upset and insisted that they go to the title company and execute a new deed. D. Lazarevic Test., November 7, 2012. Donna's testimony supports this version of the events. Do. Lazarevic Test., November 7, 2012.

The three siblings went to Warranty Title Company. The Debtor admits that he had done business with this title company in the course of his other real estate business. D. Lazarevic Test., November 6, 2012. He testified that they met with Sonya Crawford, and Danka requested a

quitclaim deed. She executed a quitclaim deed ("Quitclaim Deed") conveying to her brother a joint interest with right of survivorship in the Residence. Trial Ex. 23. The Deed states that it was prepared by the Debtor, although he denied this fact at trial. D. Lazarevic Test., November 6, 2012. He testified that it was prepared by an employee of Warranty Title. *Id.*

The Minors challenge the Debtor's version of the story. They ask the court to infer from the Debtor's name on the Quitclaim Deed that he prepared the deed and induced his distraught sister to give him control of her major asset, the Residence. The fact that Danka told Zeke two weeks earlier that she had conveyed the Residence to her brother does not support the Minors' contention that the Quitclaim Deed was a document that Danka did not understand she was signing, whoever prepared it. Alternatively, they would ask the court to infer that the lack of trust language in the Quitclaim Deed is the result of the Debtor's drafting rather than an accurate representation of Danka's wishes. To support this theory, the Minors provided testimony from the manager of Warranty Title. She testified that the company has no record of having prepared the Quitclaim Deed and the company has no file for Danka in 2006. Martin Test., November 8, 2012. In addition, although the Debtor testified that he signed the Quitclaim Deed, his signature does not appear on the copy of the Quitclaim Deed provided to the court. Dragan Dep., p. 31; Trial Ex. 23, Quitclaim Deed. The Quitclaim Deed contains no reference to the Minors or any trust obligation. It contains no recital regarding the specific consideration given for the Quitclaim Deed. Trial Ex. 23. The manager of Warranty Title did testify at trial that the Quitclaim Deed was notarized by an individual who is an employee of Warranty Title and it was on the form used by the title company. Martin Test., November 8, 2012. The Quitclaim Deed was recorded in the Office of the Registrar of Hamilton County, Tennessee. Trial Ex. 23. For these reasons, the

14

court finds the Debtor's testimony credible regarding the execution of the Quitclaim Deed at Warranty Title.

*(e) Validity of the Residence Transfer*

As a final challenge to the validity of the Quitclaim Deed, the Minors raise the issue of Danka's competency to execute the deed on June 22, 2006. At trial, the Minors argued that Danka was not competent to sign the Quitclaim Deed and that the Debtor manipulated her into going to Warranty Title and signing a deed he prepared to get the Residence for himself. Although Danka was a woman who had just been given the news that she was dying, there is no evidence that she did not go to Warranty Title of her own free will. Zeke admits that she told him two weeks earlier that she had transferred the Residence to her brother. In that conversation, he understood that the Debtor might sell the property. Z. Adamovic Test., November 6, 2012. The Debtor and his sister testified that when Danka signed the Quitclaim Deed on June 22, 2006, she appeared to be of clear and sound mind, and that she was not under duress. Danka could walk unassisted, did not need a wheelchair, and could see. D. Lazarevic Test., November 7, 2012. Do. Lazarevic Test., November 7, 2012.

The Minors offer a different picture through the medical records. Those records reflect that Danka had a brain tumor on that date which would cause her death eight days later. According to her medical records on that day, Danka was "completely wheelchair bound" and could not see. Trial Ex. 76, p. 3. She was also "[p]ositive for fatigue and feeling bad physically" and was also "[p]ositive for change in vision, eye pain, hearing problems, sore mouth, and trouble swallowing." *Id.* at 3-4. She was experiencing "arm pain, leg pain, neck pain, and joint pain," as well as experiencing "withdrawal, anxiety, and troubling thoughts." *Id.* She was a

15

woman "doing very poorly." *Id.*

Danka's Hospice Records from June 22, 2006 indicate that she was suffering from "[i]ncreasing generalized weakness and left side loss of control or use due to brain involvement. Unable to walk since Sunday." Trial Ex. 75, Hospice Records, p. 6. Her speech was "at times difficult to understand due to language barrier and possible effects of disease. . . ." *Id.* In addition, the hospice registered nurse indicates in her affidavit that Danka had been receiving morphine sulfate 15 mg twice a day prior to the nurse's visit on June 22, 2006. *Id.* at 7. Trial Ex. 91, Affidavit of Diane Case ("Case Aff."), p. 4, ¶ 9. However, the hospice nurse's notes also reflect that Danka was able to talk about her assets, her concerns for her children's wellbeing and other family concerns. Trial Ex. 75, Hospice Records, p. 11. The notes do not indicate that the nurse perceived those comments as being incoherent or evidencing of a lack of awareness of her surroundings and actions. *Id.* Danka also signed the documentation with Hospice on that day. Trial Ex. 75, Hospice Records, p. 27.

The Court concludes that Danka was competent on June 22, 2013 to execute the Quitclaim Deed. That deed contained no written trust obligations or restrictions on the Debtor's rights after Danka's death. The writing granted the Debtor an unrestricted fee ownership interest in the Residence after her death.

*(f) Existence of Oral Restrictions on the Debtor's Interest in the Residence*

The issue of the most financial significance in the case is whether there were any **unwritten** restrictions on the Debtor's interest in the Residence.

There is no testimony that anyone heard the Debtor tell Danka that he would maintain the house for his nephews if she would give him the Residence. There is no evidence that he

16

instigated the transfer at all. Even Zeke testified it was Donna who asked him about putting the

house in the Debtor's name. The decision to transfer the house seems to have been Danka's.

As to the whether she created an oral trust, the court finds that there is not clear and

convincing evidence that she did. The evidence presented at trial in support of the existence of an

oral trust is the testimony of Zeke and Alex. Alex testified that his mother had told him that she

had made arrangements for them and that the house would be theirs and that their uncle would

take care of the house for them. Testimony of Alex Adamovic ("A. Adamovic Test."), November

6, 2012. Zeke also testified that Danka told him that she had put the house in her brother's name

for the Minors. He testified that Donna approached him indicating that there was a trust. Z.

Adamovic Test., November 6, 2012. The Minors also offer the Debtor's responses to

interrogatories propounded to the Debtor during the course of the Tennessee Lawsuit. The

Debtor responded to Plaintiff's question regarding conversations the Debtor had with Danka

regarding her wishes for the disposition of her assets following her death. Trial Ex. 10, p. 4. The

Debtor responded that Danka "would her assets given to her sons, however, once the obligations

she had were satisfied [sic]." *Id*. There is no clarification in the interrogatories of what either the

assets or the obligations were.

At trial the Debtor attempted to avoid what appears to be an admission that he believed

that the Minors had some interest in the Residence. He testified that in the interrogatory

response, he was only referring to assets that had not already been transferred to him and

therefore he had not considered the Residence to be one of the assets to which he was referring.

D. Lazarevic Test., November 7, 2012.

The thrust of the Minors' argument in support of the trust is that their mother must have

17

created a trust for their benefit because she loved them more than anything else in the world. From that undisputed fact, they extrapolate that she must have wanted them, not the Debtor, to have the benefit of any value in her largest asset, especially when the asset may have generated as much as $80,000 in equity upon its sale. They also contend that the Debtor knew that this was her intention because there was no reason she would leave everything to the Debtor who was already a wealthy man.

The Debtor has an alternative explanation of why his sister Danka transferred the house to him. He testified that she was not motivated to create a trust for her sons but rather to repay the Debtor for the money that he had given her over the years to help her purchase the house, to maintain it, and to pay bills while she was sick. This alternative explanation was supported by another witness who testified that she had been at Danka's home and seen the Debtor's generosity in buying groceries. In fact she had personally delivered Danka's mail, which included her bills, to the Debtor with the understanding that he was taking care of them. Testimony of Sharon Shedrick ("S. Shedrick Test."), November 7, 2012. She also testified that Danka was concerned about her financial situation. She had missed work due to her illness and the Debtor was paying her utility bills and "taking care of all of the responsibilities of the house." *Id.* She testified that Danka had a "huge mortgage" on the house. *Id.* Donna testified that Danka viewed the house as a burden for her. Do. Lazarevic Test., November 7, 2012.

The Minors challenge the Debtor's contention that their mother felt any obligation to repay her brother. They argue there were no debts. The Debtor admits that he has no records of all of these funds he supposedly "gave" his sister. The Debtor testified that the assistance was in the form of cash. He estimated that he contributed more than $55,000 to the purchase and

18

maintenance of the Residence, but again, there are no written documents from which an

accounting could be determined. D. Lazarevic Test., November 6, 2012; November 7, 2012. The

court finds that the Debtor's testimony that he supplied financial support to the family is

credible. The court also finds that Danka may have conveyed the Residence to the Debtor in

appreciation of his help, believing in his financial ability to maintain the house and avoid a

foreclosure, and personally trusting that he would look after her children as the head of this

extended family, as her brother, and as a good uncle. However, the court cannot find sufficient

support in the record that Danka imposed any restrictions on what the Debtor could do with the

Residence or how he had to fulfill this familial obligation.

In another attempt to prove Danka created an oral trust, the Minors point to the June 22,

2006 notes of the hospice nurse as evidence of Danka's intent. The testimony of the hospice

registered nurse who cared for Danka during her critical final days, as well as the records the

nurse created at the time of Danka's care to document the care provided to Danka and her family

reflect that Danka discussed a trust with the nurse. *See* Trial Ex. 75, Hospice Records at 6. Case

Test., November 6, 2012. The nurse's medical records indicate that on June 22, 2006, the day

that Danka signed the Quitclaim Deed, the nurse noted that "[t]he family is very concerned

[Danka] bought a nice home last year and the brothers [sic] name is also on the deed. The family

wishes for a trust to be set up for the children and the father of the children not have access to the

money, set aside for the children." Trial Ex. 75, p. 6. The hospice nurse noted that terminal

issues included "need for legal paper work to protect children and finances for their future,

brotherd [sic] denial and control, patients [sic] denial and short expected time frame." *Id.* at p. 7.

The nurse noted that "no one has a POA [power of Attorney] for pt [patient] or access to her

19

accounts as she has been very independent and saw no reason to give over control." *Id.* at p. 9.

Based on her notes, the hospice nurse recalled her conversation with Danka's family that was summarized in the medical records. At the trial she testified that:

> . . . the patient had expressed concern, and the family had talked about the fact that she had this home and that there had been a divorce and that she wished that her financial assets be set aside for the children, and that her brother was going to be overseeing those and that her brother was already on the deed to the home.

Case Test., Nov. 6, 2012. Both the Debtor and Donna deny that Danka was concerned that the Residence be put in trust. They contend the property to which she was referring was the duplex owned with her former husband. D. Lazarevic Test., November 7, 2012. Do. Lazarevic Test., November 7, 2012. The court finds that the nurse's records evidence as much concern about keeping assets safe from Plaintiff as they evidence a desire to make her brother a trustee on the Residence.

The last fact that the Minors cite as an admission that the Debtor knew that he was not the owner of the Residence is the fact that he did not show the disposition of the Residence on this tax return in 2007. The Minors ask the court to treat that omission as an admission that the gains belonged to the Minors. The Debtor testified that the omission of the sale of the Residence was simply an oversight by his tax preparer. D. Lazarevic Test., November 6, 2012. While the court does not find the Debtor's explanation credible, the court does not find that the omission is an admission that the Residence was not his. The court finds that it may have been an effort to avoid paying taxes on the gain. *See infra,* Part III.F. In light of the other evidence presented regarding the manner in which the Debtor conducted his real estate business and the closing on the Residence, the court is not prepared to make such an inference in the Minors' favor.

After weighing the evidence, the court finds neither explanation of Danka's intentions to

be entirely credible. The court finds that Danka was concerned about the mortgage. At the time

of her death, several of the witnesses refer to what a burden the house was or how large the

mortgage was. The Debtor, when asked about whether Danka wanted her sons to have the house,

commented that she would not want to leave them with "such a big burden." D. Lazarevic Test.,

November 7, 2012. Donna also uses the term *burden* and testified that she had "no equity" in the

home. Do. Lazarevic Test., November 7, 2012. Danka's friend testified that Danka had a "huge

mortgage." Shedrick Test., November 7, 2012. Danka was not making a significant amount of

money and after April she was not employed at all. No one at the trial testified that she ever

mentioned equity in the home. No one seemed to think that there was equity in the home. After

all, she had only lived in the house a couple of years. *See* Shedrick Test., November 7, 2012. She

insured the home for $212,000. Plaintiff even admits that Donna mentioned putting the house in

her brother's name to avoid "foreclosure." Z. Adamovic Test., November 6, 2012. The court

finds that Danka transferred the property to avoid having to deal with her obligation on the

mortgage. She did not create a trust for the excess because she did not know that there would be

any significant value in excess of the mortgage. She was aware that the house would be in

foreclosure if someone did not take over the payments on the Residence. While the court

believes that she generally trusted her brother to do the right thing by her children as the head of

the family, she did not impose any legal obligations on him regarding how he should do so. The

court finds that the Debtor had a reasonable expectation that he would have fulfilled her wishes if

he prevented the Residence from becoming a burden to the Minors, and after that he was free to

do what he wished with any excess. Given the family traditions and the deference to the Debtor's

role as the head of the family, no one raised any opposition to that arrangement at the time.

21

The Debtor never admitted that he felt he had even a familial obligation as their uncle to provide any benefit to the Minors from the sale of the Residence, despite Hospice notes indicating that he assured Danka that her family would be taken care of. Trial Ex. 75 at 18.

The court also finds significant the fact that Zeke was not asked by Danka to be a trustee for his sons. She asked him to move into the house, but he refused, citing the problems that would be caused by her companion and his current wife. Z. Adamovic Test., November 6, 2012. He did not offer to make any payments to preserve any value for the Minors while she was sick or after she was gone. After her death, Zeke made no effort for months to discover whether the house payments were being made or how the maintenance costs were being handled. It was only after the Minors were told that the Residence had been sold that he made any inquiries about the Residence's status. In fact, it was not until Zeke discovered that the closing statement reflected a substantial profit from the sale of the Residence that he asserted any interest in the home on behalf of the Minors.

*(g) The Disposition of the Residence*

The court finds that a substantial factor in the Minors' interest in the Residence is the amount the Debtor received from the disposition of the Residence. The Debtor testified at trial that the Residence was such a burden his sister could not have possibly wanted to impose it on her children. D. Lazarevic Test., November 7, 2012. However, the Debtor sold the house approximately seven months after his sister's death to his business associate and childhood friend, David Collins. The sale closed on February 15, 2007 for a stated sales price of $299,000. Trial Exs. 24, 25, 27. The contract for sale obligated Mr. Collins to pay 10% down. *Id.* The contract for the sale of the Residence provided that Mr. Collins would also receive the stove and

22

the refrigerator. Trial Ex. 25. The Debtor also sold Mr. Collins the dining room set. D. Lazarevic

Test., November 6, 2012. The U.S. Department of Housing and Urban Development ("HUD")

settlement statement for the sale indicates that the Debtor had received a down payment of

$29,900 and received an additional $57,021.17 upon the closing of the sale. Trial Ex. 27. D.

Lazarevic Test., November 6, 2012. The $57,021.17 was deposited to the Debtor's personal

account, no. 2710. D. Lazarevic Test., November 6, 2012. A week later he moved $20,000 of the

proceeds to another account, no. 2002. From there he paid down his Home Equity Line of Credit

$10,012.50. He also wired $13,000 to Extreme Motors, a company owned by Mr. Collins. *Id.*

 To anyone reviewing the closing statement, it appears that the Debtor had just made

$86,921.17 on a "burdensome" piece of property. The Debtor did not disclose the sale to the

Minors for several months. It was their grandmother who told them that the Residence had been

sold when the Minors noticed someone moving into the house. A. Adamovic Test., November 6,

2012.

 The sudden increase in the value of the "burdensome" Residence is just one of the

eyebrow-raising facts in the court's analysis of the Residence disposition. Another fact is that the

Debtor testified that he never received the earnest money of $29,900 from Mr. Collins, despite

his representations to the contrary on the HUD settlement statement. D. Lazarevic Test.,

November 6, 2012; *see also* Trial Ex. 73, D. Lazarevic Dep., p. 85. The HUD settlement

statement includes a warning that indicates that "[i]t is a crime to knowingly make false

statements to the United States on this or any other similar form. Penalties upon conviction can

include a fine and imprisonment." Trial Ex. 27, p. 3; D. Lazarevic Test., November 6, 2012.

Third, the Debtor testified that Mr. Collins was never supposed to pay the $29,900. D. Lazarevic

23

Test., November 6, 2012. The sale price was selected to insure that a loan could be obtained in an amount sufficient to pay off the mortgage and to generate enough that the "Debtor could get out of the house what he had in it." D. Lazarevic Test., November 6, 2012. These admissions call into question whether the sale was an arm's length transaction between Mr. Collins as a buyer and the Debtor as seller.

As part of the closing documentation, the Debtor also signed under penalty of perjury a Certificate for No Information Reporting on the Sale or Exchange of a Principal Residence. Trial Ex. 84. In that certification, he represented that he "owned and used the residence as [his] principal residence for periods aggregating 2 years or more during the period ending on the date of the sale or exchange of the residence." *Id.* He also represented by marking false on the certification that he acquired the residence as part of an IRC section 1031 exchange. No evidence was provided as to whether a Form 1099(s) Proceeds from Real Estate Sale was sent to the IRS or whether his certification that it was his residence was an attempt to take advantage of the exemption for gains on the sale of a personal residence.

As to "what he had in it," the Debtor testified that he spent more than $50,000 for maintenance and upkeep of the Residence; but, as the court has already noted, he had no written records for how that sum was spent. His tax returns for this period do not reflect any such expenditures, nor do they indicate enough income to make these contributions in addition to all of the other improvements to other properties he made this same year, which will be discussed below in the section on his real estate business. *See* Trial Ex. 7. When asked why he did not pursue his sister's estate for the additional funds he had provided, he testified that when the Residence was signed over to him, he called it even at that point. D. Lazarevic Test., November

24

6, 2012.

Finally, he admits that he failed to report the transaction on his tax return for the year

2007. *Id*. He has not filed an amended return to reflect his gain or his alleged expenses in the

years since. The court finds the details of this transaction and its accounting relevant to the issue

of whether the Debtor had a business relationship with Mr. Collins that he would want to conceal

from a trustee. The court finds that the Debtor has chosen to admit lying on the HUD statement

rather than suggest that there is a note receivable owed to this estate.

      2.    *The Residence Furnishings*

Zeke testified that at the time of her death Danka had a family room set, living room set,

dining room set and an expensive bedroom suit. Z. Adamovic Test., November 6, 2012. He

estimated that the dining room set was worth $2500. *Id*. There was proof that the bedroom suit

was a gift from the Debtor and had been purchased for $2300. Trial Ex. G. The bedroom suit was

removed from the house and is being used by the Debtor in his home. A number of other pieces

of furniture are being used by the Debtor in his home. The court finds that there was no transfer

of any of the contents of the Residence at the time the Quitclaim Deed was executed, and the

Debtor provided no evidence that he was given permission to take possession of the property to

incorporate for his own use. The court finds that the furnishings in the possession of the Debtor

include a bedroom suit worth $2300 and the dining room suit worth $2500 that has been sold.

The court does not find the price that Mr. Collins paid for the furniture to be credible based on

the Debtor's admitted falsification of the terms of the sale of the Residence. By the same token

the court does not find the amount attributed to the contents of the Residence on the insurance

policy to be persuasive. As noted at trial, that amount reflects a percentage of the value of the

Residence. Danka insured the contents of her home for $159,000, and her home insurance policy reflects this amount, but contains no itemization of the property insured. *See* Trial Ex. 14.

The Debtor denies that he took anything that the Minors wanted. He contends that the furnishings were abandoned. D. Lazarevic Test., November 6, 2012. Although the Minors were allowed access to retrieve some furniture and clothing, the breakdown in the family relationship after the discovery of the Debtor's substantial gain on the sale of the Residence appears to have stopped any cooperation between the two sides. To the extent the Minors believed the Residence was being held for them, there would have been no need to remove any furnishings. The Debtor admits that he did not discuss the sale or disposition of the furnishings prior to his decision to sell them. D. Lazarevic Test., November 6, 2012.

   *3.       The Individual Retirement Accounts*

Danka had a 401(k) retirement account with Winn Management. Trial Ex. 16, Account Statement of Winn Management Group 401(k) Savings Plan, 12/31/2009; D. Lazarevic Test., November 6, 2012. The Debtor initially took the position that he had received no money from a 401(k) plan. D. Lazarevic, November 6, 2012; Trial Ex. 1, Interrogatory Response No. 5; Trial Ex. 20, Interrogatory Response No. 1. It is unclear whether Debtor had received money from the account. D. Lazarevic Test., November 6, 2012.

Danka also had an IRA at SunTrust Bank. Trial Ex. 21; D. Lazarevic Test., November 6, 2012. There is no record of who was named as the beneficiary on the IRA. The Debtor testified that Danka directed him to close this account on June 26, 2006 to help pay for funeral expenses. Trial Ex. 21; D. Lazarevic Test., November 6, 2012. The IRA was closed, and $7,711.73 was moved to a SunTrust Deposit Account in Danka's name. Trial Ex. 21 at 2. On June 28, Danka

26

allegedly wrote a check to the Debtor for $8075 which he deposited into his account. *Id.* at 4; D.

Lazarevic Test., November 6, 2012. Danka's signature on the notarized Quitclaim Deed executed

on June 22 and her signature on the Hospice Records of the same date are noticeably different

than her signature on the check to the Debtor for $8075 on June 28. Trial Ex. 75 at 27; Trial Ex.

21. The Debtor's checking account records indicate that he deposited $8,075 into his checking

account on June 29, 2006, although in his interrogatory responses he claims that he initially

stated he never received any money from Danka's IRA. Trial Ex. 20, Response to Interrogatory

No. 1.

      The Minors assert that Danka was not competent to make financial decisions on June 26,

2006 based on her Hospice Records. Trial Ex. 75, Hospice Records, p. 11. Those records

indicate that Danka was already in the "dying process" on June 26, 2006. *Id.* at p. 12. On June

23, she was reportedly experiencing hallucinations and was only able to make "simple choices

about what she does and doesn't want," with only an ability to "think through other, more

complicated things. . . ." *Id.* at p. 11. At that time the family wanted to obtain the services of an

attorney to help Danka create a will, but it was unclear whether "she had the capacity to

complete those directives." *Id.*

      The Debtor admitted that Danka was unable to withdraw the funds without assistance. D.

Lazarevic Test., November 6, 2012. He testified that she asked him to withdraw her IRA funds

for use in paying for her funeral. D. Lazarevic Test., November 6, 2012; Trial Ex. 86, Affidavit

of Grozdana "Donna" Lazarevic ("Donna Aff."), ¶ 6. The Minors claim that on June 26, 2006

when Danka withdrew her IRA funds, deposited them in her checking account and then wrote a

check to the Debtor, she was incompetent due to her illness. The Hospice Records pertaining to

Danka's medical condition at that time support the Minor's position. Trial Ex. 75, Hospice Records, pp. 11-12. The court finds that Danka was not competent to transfer the IRA funds.

The Debtor testified that he spent $15,000 on Danka's funeral. The court finds that his contentions about how much he spent are irrelevant to whether he had authority to take those funds. Trial Exs. H, I. There was no evidence that he consulted with Zeke or the Minors on what would be spent or even disclosed that he was spending what would have been the Minors' funds. The Hospice Records indicate that the family brought up the issue of funeral arrangements on the Friday after their first visit. The notes indicate that on Monday, June 26, the Debtor had come to terms with his sister's imminent death. The court finds that at that time the Debtor decided to take control of his sister's assets without regard to any interest that the named beneficiaries or her heirs may ultimately have had in the account. Despite her request for an attorney, no attorney was contacted. Trial Ex. 75, Hospice Records at 11-12.

4.      *The Volunteer Bank Account*

Danka's assets also included $600 in a checking account at Volunteer Bank. The Debtor admitted to obtaining those funds by forging his sister's signature several months after her death. Trial Exs. 17-19. There is no evidence that the funds in this account were conveyed to the Debtor prior to his unilateral action to obtain the funds.

5.      *The Automobile*

Danka owned a Hyundai Sonata. Z. Adamovic Test., November 6, 2012. The parties also disagree about what Danka's intentions were with respect to her vehicle. There was no transfer of the title prior to Danka's death. D. Lazarevic Test., November 6, 2012. Donna testified that her sister let her use her car because Donna's car was having problems.

28

> Q:          Okay. What was her wishes as far as that car goes that she wanted?
> A:          Well, towards around that time she kind of felt bad because the car that she was driving that she loaned from me and my husband, the transmission died on her, so me driving her back and forth, me and my husband at the time, after the transmission died while in my sister's care, he had to drive it to work. So I was using her car to drive and she just wanted me to keep it and drive it and do all her errands. I used to go and pick up the boys a lot from school, take them to school, take her to doctors, her therapies, Sam's Club shopping, all these. Everywhere she wanted it, I would drive it.
> Q:          Did you ever put the car in your name?
> A:          Under my insurance policy – she gave me the title and all of that, I never did.   It was still registered in her name. And I felt like, you know, maybe one day, you know, she's going to get better, I'm not going to.

Do. Lazarevic Test., November 7, 2012.

The court does not find that the desire to have her sister use her car is the equivalent of a transfer of ownership of the car to her sister. Nor does the court find that it was an expression of any kind of desire that the car's proceeds be given to the Debtor.

The Debtor, not Donna, sold the car and took the money from the sale. Zeke asserts that the price for which the car was listed for sale was $4,500, although the Debtor claims he only received $2,800 from the sale. Z. Adamovic Test., November 6, 2012. D. Lazarevic Test., November 6, 2012. The documentation regarding the sale of the car was not produced. There is no copy of a bill of sale either to Donna or to the ultimate buyer of the car in evidence. The court finds that the car was sold for $2800 after Danka's death while still titled in Danka's name. As her sole heirs, the Minors should have received the car or its proceeds. Contrary to their rights, the Debtor took and used the proceeds for his benefit.

6.    *The Jewelry Collection*

The Plaintiff and one of the Minors, Alex, both testified that there was a significant amount of gold jewelry owned by Danka. *See* Trial Ex. Q, Deposition of Zivorad Adamovic ("Z. Adamovic Dep."), pp. 31-32; A. Adamovic Test., November 6, 2012. The Plaintiff testified that

Danka had "gold jewelry" and "jewelry from her grandma . . . jewelry where I bought her . . . jewelry since she was a girl . . ., and she had jewelry from when we got together." Z. Adamovic Dep., p. 32; *see also*, Z. Adamovic Test., November 6, 2012. He speculated that it was more than thirty pieces of jewelry. Z. Adamovic Test., November 6, 2012. At trial, Alex Adamovic testified that there was "so much jewelry in the container . . . she had to lay it in there all messy." A. Adamovic Test., November 6, 2012. At trial, the Debtor offered photographs of the jewelry which he still had in his possession that he admitted taking from his sister's home. Trial Ex. F. He stated that he was holding the jewelry for the Minors. The photographs show a number of pieces of gold jewelry, pearls, and other pieces which total substantially more than 30 pieces of jewelry. Zeke was only able to testify that there were specific pieces missing but did not testify as to their value. Z. Adamovic Test., November 8, 2012, Rebuttal. He did previously testify in his deposition that the jewelry and home furnishings were worth $40,000. Trial Ex. Q at 33.

F.    **The Debtor's Real Estate Business**

Schedule I of the Schedules and SOFA reflect that the Debtor was employed by Chattanooga Motors at the time of his filing. Trial Ex. 5, p. 6. In response to Question 1 of the SOFA he states that he had income from employment or the operation of a business of $45,515.08 in 2010 and both he and his wife together had made $127,211.00 in 2009. Trial Ex. 5, SOFA at 7. Question 2 reflects no income from sources other than employment or the operation of business in the two years prior to the filing. The 2009 tax return is attached as Exhibit 9 to the Deposition of Dragan Lazarevic and the Deposition and its Exhibits were admitted as Trial Ex. 73. The Plaintiff also introduced the 2009 tax return as Trial Exhibit 9. *See* Trial Exs. 9, 73. The 2009 tax return reflects wages of $15,805, business income of $13,950,

capital gains of $91,156, rental income of $6300 for total income of $127,211. Trial Ex. 9. The

2009 tax return schedule for Net Profit from Business reflects that the Debtor was operating a

business named Lazarevic Enterprises. The principal business was "salesman." Trial Ex. 9, p. 4;

Trial Ex. 73, Exhibit 9, p. 4. Tax Return Schedule D, line 11, "Gain from 4797, Part 1, long term

gain from Forms 2439 and 6252, and long term gain or loss from Forms 4684, 6781, and 8824"

show $91,156 in gains. *Id.* Form 4797 from which this calculation was made was attached to the

2009 tax return. It shows two properties, both acquired on August 21, 2002. One property sold in

January of 2009. It had a basis of $106,682 and sold for a profit of $43,798 and a second

property sold on March 6, 2009 which had a basis of $106,825. It sold for $141,172, generating a

gain of $47,358. Tax Return Schedule E showed two rental properties on Wygoda Circle,

Chattanooga, Tennessee. *Id.* at p. 7. The 2009 Tax return reflects that the Debtor's wife was

employed as a clerk but there is no division of wages provided indicating the name of her

employer or the portion of the wages that was attributable to her employment. *Id.* The ownership

of the properties disposed of is also not reflected in the return.

In response to questions in the SOFA, the Debtor reflects no repossessions in the year

prior to bankruptcy. Trial Ex. 5, SOFA Question 5. He reflects no transfers out of the ordinary

course of business during the two years prior to the commencement of the case. Trial Ex. 5,

SOFA Question 10. This latter statement contradicts the information on the 2009 tax return

regarding the March 6, 2009 sale of property. The statements that there were no sales or

repossessions in the two years prior to filing also leaves the disposition of the two rental units

unexplained.

The omission might be explained as transactions in the ordinary course of business,

except that the Debtor did not disclose that he was engaged in a real estate business. SOFA

Question 18 asks an individual debtor for a list of the names, addresses, nature of businesses, and

the beginning and ending dates of all businesses in which the debtor was a partner, sole

proprietor or was self-employed in a trade, profession or other activity either full or part-time

within the last six years. The Debtor responded "None." Trial Ex. 5, SOFA, Question 18. Based

on his tax returns for years in that same period, this answer is false. Six years before the filing

date was February 2005. His 2006 tax return showed Lazarevic Enterprises as a plumbing

business, although the Debtor testified he never obtained a plumbing license. Trial Ex. 6; D.

Lazarevic, November 7, 2012. In 2006 he had ten rental properties that generated $179,200 in

total rent on which he paid mortgage interest of $126,892 a year. Trial Ex. 6. In 2007, he owned

all of those rental properties from which he reported rental income of $148,100 with mortgage

deductions of $108,416. Trial Ex. 7.

Form 4797 shows six additional properties he bought in 2007 and resold that same year

for little or no profit because of an increase in the bases of the properties. Trial Ex. 7 at 12. These

sales total $693,000. When asked at trial about his records for the total increase of approximately

$145,000 in the bases of these properties, the Debtor explained that he had done work and repairs

on the properties. When asked if he had any records to document these expenditures, he said he

did not have any. D. Lazarevic Test., November 6, 2012.

The funding for at least four of the six properties flipped in 2007 came from David

Collins and his company Extreme Motors. The source of funds to purchase the five properties

was wired from these two sources into the Debtor's accounts. When the properties were sold

approximately one month later, the proceeds were deposited into various accounts of the Debtor.

From those accounts, the Debtor wired amounts, which total the funds received and more, back to Mr. Collins or Extreme Motors, Inc. *See e.g.,* Trial Exs. 100, 101, 102.

As additional evidence of a business relationship with Mr. Collins, the Debtor's name is shown as an obligor on a deed of trust secured by property at 1823 Jenkins Road, Chattanooga Tennessee. Trial Ex. 51. The Debtor signed a Deed of Trust for the property and there is a claim filed by the lender secured by this property in his bankruptcy case. *See* [Bankr. Case No. 11-10585, Claim No. 2]. At trial, he testified that he had no ownership interest in the property and that his name appeared on the deed because he had signed the purchase contract as an agent for Mr. Collins. D. Lazarevic Test., November 6, 2012. Based on the pattern of payments to Mr. Collins, the court does not find this statement credible. Donna also testified that the Debtor managed houses for Mr. Collins. Do. Lazarevic Test., November 7, 2012. She testified that the Debtor paid her rent for 5 years for her lease for the 1823 Jenkins Road rental home. From her testimony it appears that the Debtor was working for or with Mr. Collins as late as April of 2011. *Id*. Like his real estate operations of 2007 and 2008, there is no mention of this property maintenance business or employment for Mr. Collins in the Debtor's schedules or SOFA.

### G.    The Administration of Danka's Estate

The Debtor filed to administer his sister's estate in 2009 and listed himself and his mother and sister as heirs of Danka's estate in addition to the Minors. This action was taken two years after Danka's death and after the Plaintiff filed the Tennessee Lawsuit. Trial Ex. 15.

### IV.    Analysis

### A.    The Plaintiff's Section 523(a) Claims

11 U.S.C. § 727 provides for the discharge of an individual from any specific debt unless that debt is excepted from discharge pursuant to 11 U.S.C. § 523. 11 U.S.C. § 727(a)-(b). The

33

creditor must prove by a preponderance of the evidence that its debt is non-dischargeable under

11 U.S.C. § 523. *See Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 659 (1991).

Exceptions to discharge are narrowly construed in the debtor's favor. *See Monsanto Co. v.*

*Trantham (In re Trantham)*, 304 B.R. 298, 306 (B.A.P. 6th Cir. 2004). The Minors have raised

three grounds on which they ask the court to find that the Debtor's obligations to them are not

dischargeable.

    **1.**    **Section 523(a)(2)(A)**

    *(a)*    *False Representations Relating to Sale of Residence*

The Minors contend that they are owed the value of the equity which the Debtor received

from the sale of the Residence. They contend that the amount is $87,000 based on the HUD

Closing Statement. Further, they contend the debt is non-dischargeable because the Debtor

obtained these proceeds by misleading their mother into giving him the Residence with the

promise that he would preserve it for them. 11 U.S.C. § 523(a)(2)(A) prohibits discharges of debt

based on "(A) false pretenses, a false representation, or actual fraud, other than a statement

respecting the debtor's or an insider's financial condition; . . ." The Sixth Circuit has held that to

demonstrate nondischargeability pursuant to 11 U.S.C. § 523(a)(2)(A), a creditor must prove

four elements:

> (1) the debtor obtained money through a material misrepresentation that, at the
> time, the debtor knew was false or made with gross recklessness as to its truth; (2)
> the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the
> false representation; and (4) its reliance was the proximate cause of loss.

*Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280-81 (6th Cir.

1998). A creditor bears the burden of demonstrating these elements by a preponderance of the

evidence. *Id.* at 281 (relying on *Grogan*, 498 U.S. at 291, 111 S.Ct. at 661). The court finds that

34

this objection must fail because the Minors have not demonstrated that the Debtor made any representation to his sister to induce her to transfer her house to him. All the proof indicates that it was her idea to have someone else take over the Residence and the obligations that went with it. She had limited resources of her own. She went to her brother and her ex-husband seeking someone to take it over. Her ex-husband knew she was transferring it to her brother before she did it. She told the hospice worker she had done it. No one testified that the Debtor ever said he would do anything more than accept an ownership interest in the Residence. The proof as to why she transferred it or what she expected the Debtor to do with it is contradictory, and both the Minors and the Debtor have credible and incredible aspects to their versions of her intentions.

The court is aware that an objection to dischargeability may be based on something broader than a specific statement by the debtor. In *In re Vitanovich* the Sixth Circuit Bankruptcy Appellate Panel addressed the meaning of "actual fraud" within the context of § 523(a)(2)(A):

> We adopt the position of the Court of Appeals for the Seventh Circuit that actual fraud as used in 11 U.S.C. § 523(a)(2)(A) is not limited to misrepresentations and misleading omissions. When a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code.

*Mellon Bank v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001) (citing *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000)). The Sixth Circuit Bankruptcy Appellate Panel made clear that it finds that "actual fraud" is broader than a misrepresentation and encompasses "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *In re Vitanovich*, 259 B.R. at 877 (citing *McClellan*, 217 F.3d at 893). The Sixth Circuit Bankruptcy Appellate Panel further explained that:

35

"Actual fraud has been defined as intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed. It requires intent to deceive or defraud."

*In re Vitanovich*, 259 B.R. at 877 (quoting *Gerad v. Cole (In re Cole)*, 164 B.R. 951, 953 (Bankr. N.D. Ohio 1993)) (other quotation omitted).

The Plaintiff has not shown by a preponderance of the evidence that the Debtor engaged in any scheme or artifice to obtain his interest in the Residence. The Debtor did not induce Danka to put his name on the deed. The Debtor did not lead his sister to believe that the house had no value.

(b)      *False Representations Relating to IRA Funds*

The equity in the Residence is not the only asset which the Minors contend was taken from them by fraud. They also seek to recover the proceeds of the retirement and bank accounts. Four days after she conveyed the Residence, Danka was no longer able to sign her medical documents herself. The Debtor took control of her affairs and removed funds from her SunTrust IRA account. He now alleges that they were for her funeral expenses. The Debtor testified that Danka told him to get those funds to pay for her funeral, and he did so. D. Lazarevic Test., November 6, 2012. D. Lazarevic Test., November 7, 2012. The court does not believe the Debtor's testimony on this issue based on the medical records provided by Hospice. Trial Ex. 75, Hospice Records. Hospice raised the issue of funeral expenses on Friday, June 23, 2006, and there had been no plans made. The Debtor testified that he did not discuss funeral arrangements with his sister until two or three days after June 22. D. Lazarevic Test. Nov. 7, 2012. The Debtor's efforts to begin the withdrawal process of these funds occurred on Monday, June 26, only four days from Danka's death. The Debtor testified he had to sign her medical forms by that

36

date. The Hospice Records indicate that she was incoherent and heavily drugged by this date.

Trial Ex. 75 at 10-11. Her ability to communicate was severely limited. The court questions

whether she even signed the document to close the account. The court does not find that she was

competent to consent to that transfer. The court finds that his involvement in the closing of the

IRA was an artifice to obtain control of those funds to cover his expenses should he have to pay

for his sister's funeral expenses. The court finds that the brother who had been in denial about his

sister's condition took control of the situation that Monday and ensured that all of his sister's

assets were at his disposal at the time when she was no longer competent to handle her own

affairs. However, these actions were not acts of deception on which Danka relied. Having found

she was no longer competent, the court cannot find any reliance by Danka on any action taken by

her brother that was ultimately determined to be a misrepresentation to her.

>    *(c)    False Representations Pertaining to Bank Account Funds*

With respect to the funds in the Volunteer Bank account, the court finds that there was no

testimony that Danka ever gave the Debtor authority to withdraw any funds from that account.

The Debtor admitted he forged her name after her death and used the funds for himself. The

court finds that the forgery is evidence of a misrepresentation, but it was not a misrepresentation

on which Danka or the Minors relied. Like the SunTrust IRA proceeds, the court will discuss this

transfer in the context of willful and malicious injury, but it does not find that the Minors have

shown by a preponderance of the evidence that the loss of the $600 is the result of the Debtor's

false representation or fraud on the Minors.

>    *(d)    False Representations Relating to the Vehicle*

With respect to the automobile, the Debtor obtained possession of the automobile to sell

from his sister Donna who claims Danka gave it to her in appreciation for Donna's willingness to be Danka's "chauffeur" while Danka was ill. There is no evidence that the Debtor was involved in the discussions between the sisters at all regarding the car. The court finds that the Minors have failed to demonstrate that the Debtor obtained the proceeds to the car by false pretenses or fraud. Whether the Debtor had any authority to sell the car and keep the proceeds from the sale will be discussed below with respect to willful and malicious injury.

(e)    *False Representations Pertaining to the Jewelry*

The court does not find that the Debtor obtained the jewelry by fraud or misrepresentation. He simply took it without any representation to anyone. The obligation to return the jewelry or its value was not the result of fraud or false pretenses.

## 2.    Section 523(a)(4)

The court finds that the objection to discharge based on defalcation must also fail. With respect to defalcation while acting in a fiduciary capacity, the Sixth Circuit has provided that the preponderance of the evidence must establish: "(1) a pre-existing fiduciary relationship, (2) a breach of that relationship, and (3) resulting loss." *Patel v. Shamrock Floorcovering Services, Inc. (In re Patel)*, 565 F.3d 963, 968 (6th Cir. 2009) (citing *Board of Trustees v. Bucci (In re Bucci)*, 493 F.3d 635, 642 (6th Cir. 2007)).

Thus, to prove fraud or defalcation by a fiduciary, the Minors needed to prove "the existence of an express or technical trust," and "demonstrate: '(1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary.'" *In re Bucci*, 493 F.3d at 639-40 (quoting *R.E. America, Inc. v. Garver (In re Garver)*, 116 F.3d 176, 179 (6th Cir. 1997)). Further, "state law is important in determining when a trust relationship exists." *Carlisle Cashway, Inc. v.*

*Johnson (In re Johnson)*, 691 F.2d 249, 251 (6th Cir. 1982)). *See also, Baker v. Wentland (In re Wentland)*, 410 B.R. 585, 597 (Bankr. N.D. Ohio 2009) (noting that "the determination of whether an express or technical trust exists is governed by state law"). Under Tennessee law:

> [a] valid trust need not be in writing. It can be created orally unless the language of the written conveyance excludes the existence of a trust. However, when a party seeks to establish an oral trust, it must do so by greater than a preponderance of the evidence.
>
> The existence of a trust requires proof of three elements: (1) a trustee who holds trust property and who is subject to the equitable duties to deal with it for the benefit of another, (2) a beneficiary to whom the trustee owes the equitable duties to deal with the trust property for his benefit, and (3) identifiable trust property.

*Kopsombut-Myint Buddhist Center v. State Board of Equalization*, 728 S.W.2d 327, 333 (Tenn. Ct. App. 1987). Tennessee law provides that:

> (a) A trust is created only if:
> (1) The settlor has capacity to create a trust;
> (2) The settlor indicates an intention to create the trust;
> (3) The trust has a definite beneficiary . . .
> (4) The trustee has duties to perform; and
> (5) The same person is not the sole trustee and sole beneficiary.

Tenn. Code Ann. § 35-15-402(a).

The Debtor points out that "Tennessee law permits an express trust in realty to rest upon a parol agreement;" however, "[i]n order for a trust to rest upon a parol agreement, . . . the declaration of trust must have been made prior to or contemporaneous with a transfer, either by deed or will, of an interest in realty." *Meadows v. Smith*, No. E2012-00095-COA-R3-CV, 2012 WL 3646556, at *4 (Tenn. Ct. App. Aug. 27, 2012) (citing *In re Guardianship of Hodges*, W2000-01424-COA-R3CV, 2001 WL 609553, at *2 (Tenn. Ct. App. June 1, 2001)). Here, there is no evidence of an agreement between the Debtor and his sister to do anything other than have her brother "take over" the house. There was not clear evidence regarding how the Debtor was to

preserve any value of the house for his nephews or how he was to pay the mortgage. He held the property for seven months with no assistance or challenge from any party. The written language of the deed to the Debtor makes no reference to a trust. While Danka, Zeke, or the Minors might have thought that the Debtor, as the recipient of the $57,000 to $87,000 windfall, would have felt some familial obligation to share this good fortune with his nephews or to mend hurt feelings by providing an accounting of how much he had provided to their mother, Danka imposed no legal obligation on him to do so. Despite Danka's love for her children, she did not make clear what obligations her brother had toward them. The existence of an oral trust and "its terms may be established only by clear and convincing evidence." Tenn. Code Ann. § 35-15-407. The court does not find such clear and convincing evidence exists. Having found no trust, the court cannot find that any defalcation was committed by the Debtor.

The Plaintiff further seeks his attorney's fees and costs relating to his claim under 11 U.S.C. § 523(a)(4). Under Tennessee law: "(a) In a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party or from the trust that is the subject of the controversy." Tenn. Code Ann. § 35-15-1004. Since the court has not found the existence of a trust, the court also finds that the Minors are not entitled to attorneys' fees under this statute.

**3.    Section 523(a)(6)**

The Residence is not the only property at issue in the case. It is, however, the only property that the court finds was transferred by Danka while she was competent. The remaining property was still hers at her death and should have been delivered to her heirs. The Debtor, in

contravention of the heirs' rights, took control of the property and used it for his own benefit. 11

U.S.C. § 523(a)(6) states in relevant part:

> A discharge under section 727. . . of this title does not discharge an individual
> debtor from any debt – . . .
>
> > (6) for willful and malicious injury by the debtor to another entity
> > or to the property of another entity . . . .

11 U.S.C. § 523(a)(6).

Whether a debt is dischargeable pursuant to 11 U.S.C. § 523(a)(6) is determined by

analyzing federal law. *See e.g., J & A Brelage, Inc. v. Jones (In re Jones)*, 276 B.R. 797, 800-01

(Bankr. N.D. Ohio 2001) (citing *Call Federal Credit Union v. Sweeney (In re Sweeney)*, 264

B.R. 866, 870 (Bankr. W.D. Ky. 2001); *Hinze v. Robinson (In re Robinson)*, 242 B.R. 380, 388

(Bankr. N.D. Ohio 1999)). 11 U.S.C. § 523(a)(6) provides that a debt that is *both* willful *and*

malicious is nondischargeable. *See* 11 U.S.C. § 523(a)(6). "[T]he judgment must be for an injury

that is both willful and malicious. The absence of one creates a dischargeable debt." *Markowitz*

*v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999). The U.S. Supreme Court has

addressed the meaning of "willful" within the context of § 523(a)(6). *Kawaauhau v. Geiger*, 523

U.S. 57, 118 S.Ct. 974 (1998). As summarized by the Sixth Circuit:

> [t]he Court held that "willful" means "voluntary," "intentional," or "deliberate."
> As such, only acts done with the intent to cause injury – and not merely acts done
> intentionally – can cause willful and malicious injury. The Court explained its
> holding by discussing the importance of context:
>
> > The word "willful" in (a)(6) modifies the word "injury," indicating
> > that nondischargeability takes a deliberate or intentional *injury*, not
> > merely a deliberate or intentional act that leads to injury. Had
> > Congress meant to exempt debts resulting from unintentionally
> > inflicted injuries, it might have described instead "willful acts that
> > cause injury." Or, Congress might have selected an additional
> > word or words, i.e., "reckless" or "negligent," to modify "injury."

41

> Moreover, as the Eighth Circuit observed, the (a)(6) formulation
> triggers in the lawyer's mind the category "intentional torts," as
> distinguished from negligent or reckless torts. Intentional torts
> generally require that the actor intend "the *consequences* of an
> act," not simply "the act itself."

*In re Markowitz*, 190 F.3d at 464 (quoting *Geiger*, 523 U.S. at 61-62, 118 S.Ct. at 977).

Following the lead of the Supreme Court in *Geiger*, the Sixth Circuit held that "unless 'the actor

desires to cause consequences of his act, or . . . believes that the consequences are substantially

certain to result from it,' he has not committed a 'willful and malicious injury' as defined under §

523(a)(6)." *In re Markowitz*, 190 F.3d at 464.

Proof of willful behavior must often be demonstrated through the use of circumstantial

evidence. *See In re Jones*, 276 B.R. at 802. The bankruptcy court in *In re Jones* noted that

"willful" behavior can "be indirectly established by the creditor demonstrating the existence of

two facts: (1) the debtor knew of the creditor's lien rights; and (2) the debtor knew that his

conduct would cause injury to those rights." *Id.* The court finds that the Debtor was aware of

what rights he had been given by his sister and what rights he simply took in the days

immediately before and after her death. There is no evidence that he discussed any of the

transactions involving the automobile, the SunTrust IRA, the bank accounts or the sale of the

furniture with the Minors or the Plaintiff. When he defensively filed a probate action, he did not

disclose these transactions in his reports to the court and in fact, initially denied some of the

transfers in the answers to his interrogatories. Even at the time he filed bankruptcy, he did not

disclose the existence of the jewelry in his possession as property being held for another in his

SOFA. The court finds that his belated claim that he was holding the jewelry for his nephews,

while denying there was ever any discussion of his trust obligations, is not credible. This belated

42

claim of familial concern does not absolve the Debtor of the consequences of taking the jewelry

into his possession and not turning it over for two years. From this conduct, the court finds that

he knew of the Minors' rights and that his conduct was a direct violation of their interests. Their

loss of the jewelry caused them injury and they are entitled to damages equal to the jewelry's

value.

As to the element of malice, a malicious injury occurs "when a person acts in conscious

disregard of their duties or without just cause or excuse." *In re Jones*, 276 B.R. at 803 (citing

*Gonzalez v. Moffitt (In re Moffitt),* 254 B.R. 389, 396 (Bankr. N.D. Ohio 2000)). A finding of

maliciousness does not require a determination of ill-will or specific intent. *See In re Trantham*,

304 B.R. at 308. However, malice requires the finding of a level of conduct beyond negligent or

reckless behavior. *West Michigan Community Bank v. Wierenga (In re Wierenga)*, 431 B.R. 180,

185 (Bankr. W.D. Mich. 2010) (citation omitted); *see also, JP Morgan Chase Bank, NA v. Algire*

*(In re Algire)*, 430 B.R. 817, 823 (Bankr. S.D. Ohio 2010); *Geiger*, 523 U.S. at 64, 118 S.Ct.

974. A creditor may prove the element of maliciousness by demonstrating that "(1) the debtor

has committed a wrongful act, (2) the debtor undertook the act intentionally, (3) the act

necessarily causes injury, and (4) there is no just cause or excuse for the action." *In re Algire*,

430 B.R. at 823 (citing *Vulcan Coals, Inc. v. Howard*, 946 F.2d 1226, 1228 (6th Cir. 1991),

abrogated on other grounds by *Geiger*, 523 U.S. 57). The court has previously found the first

three elements to exist. The only question is whether there was a just cause for the action.

The justifications given by the Debtor relate to the house furnishings, the automobile and

the IRA proceeds. As to house furnishings, the Debtor states that he thought the furniture had

been abandoned because it had not been picked up. The court does not find this testimony

credible. The court finds that there was clearly tension between the family members before and

after Danka's death. There is no evidence that selling furniture and moving other furniture into

his home was discussed with the Minors or that the Debtor had any reason to believe that they

did not want it or the proceeds from its sale for school or other needs. With respect to the

automobile, the Debtor offers that he thought the car had been given to his sister and that she

allowed him to keep the proceeds. The Debtor is in the automobile sales business. The fact that

the title was never transferred and that the sale documentation is unavailable leads the court to

find this explanation is not credible.

Finally, as to the SunTrust IRA, the Debtor offers that he was directed by Danka to use

the funds from the IRA to pay for his sister's funeral expenses. The court has found she was

incompetent at the time these directions were supposedly given. The Debtor also spent a

substantial amount of his testimony at trial describing how he loved his sister, how he had taken

care of her, how he was the head of the family, and how he considered all of her debts to him

paid by the transfer of the Residence. There is no evidence that his payment of the funeral

expenses was contingent on Danka's conveying her IRA to him. The Debtor chose to handle the

funeral arrangements without any input from the Minors or their father. The evidence provided

for the expenses does not have any relationship to the amount that was taken from the IRA.

Finally, the court is concerned that the IRA, which generally requires a designation of a

beneficiary, was the asset that was allegedly used for funeral expenses. Other than the Residence,

this would have been the only other asset for which Danka's instructions for the distribution of

the proceeds should have been available in writing. It was the only substantial "money" she had,

and on June 22, 2006, she wanted her "money" to be put in trust for her children. She did not say

44

she wanted it to be used for her funeral expenses.

In *National Sign and Signal v. Livingston* the district court explained that the § 523(a)(6) exception applies where the injury invades a creditor's legal rights. 422 B.R. 645, 653 (W.D. Mich. 2009) (citing *Steier v. Best (In re Best)*, 109 F. App'x 1, 6 (6th Cir. 2004)). The district court quoted the Sixth Circuit decision in *In re Best* noting:

> Section 523(a)(6)'s term "willful . . . means deliberate or intentional invasion of the legal rights of another, because the word 'injury' usually connotes legal injury (*injuria*) in the technical sense, not simply harm to a person." The conduct "must be more culpable than that which is in reckless disregard of creditors' economic interests and expectancies, as distinguished from . . . legal rights. Moreover, knowledge that legal rights are being violated is insufficient to establish malice . . .

*Livingston*, 422 B.R. at 653 (quoting *In re Best*, 109 F. App'x at 6). The court in *Livingston* noted that there are three elements that a creditor must demonstrate to state a claim under § 523(a)(6): "(1) the debtor's conduct was willful and malicious, (2) it suffered an invasion of its legal rights or to the legal rights to its property, and (3) the invasion was caused by the debtor's conduct." 422 B.R. at 653 (citing *CMEA Title Agency v. Little (In re Little)*, 335 B.R. 376, 383 (Bankr. N.D. Ohio 2005)).

The court concludes that the Debtor has willfully taken actions to take into his possession the proceeds from the automobile, the proceeds from the IRA, the proceeds from the Bank Account, the home furnishings and the jewelry, all without any transfer document or permission from Danka given at a time she was competent. But for his conduct, all of the money and assets would have been given to the Minors as the beneficiaries of their mother's intestate estate. Instead of turning over these assets to the Minors, the Debtor used them for himself, incorporated them into his home, failed to disclose them, and delayed turning them over by filing an

administration of his sister's estate years after her death. He has now been replaced as the

administrator, and the state court is awaiting this court's ruling on the issue of the existence of

the trust. The Debtor is now seeking to justify his acts of conversion as collection on debts owed

to him by his sister or admitting he was holding the jewelry in trust.

The court finds that the Debtor converted assets to which the Minors were entitled and he

did so willfully and maliciously. His intent may be inferred from the manner in which he hid the

disposition of the furnishings to his close friend, initially refused to account for any of the

proceeds for the funeral, and misstated what actions he had taken in the answers to his

interrogatories. The court finds that the Minors are entitled to a nondischargeable judgment in

the amount of $51,075 for the willful and malicious injury to their property based on Section

523(a)(6). This amount is based on $2400 for the automobile, $8075 for the SunTrust account

proceeds, $600 for the funds from the Bank Account, and $40,000 for the value of the jewelry

and furniture, based on Zeke's deposition testimony that the Plaintiff included as a trial exhibit.

Trial Ex. Q at 33. The court has included $2300 for the value of the bedroom suit and $2500 for

the value of the dining room suit into the total amount of $40,000 for the jewelry and furniture. If

the court subtracts the amounts awarded for these specific items of furniture, the jewelry and

remaining household goods are worth $35,200. The court is aware that some items of the jewelry

collection remaining in the Debtor's possession may have sentimental value to the Minors, and

they may prefer to receive the actual pieces of jewelry rather than damages. To the extent the

Minors receive any specific items of jewelry from the Debtor or the administrator of their

mother's estate, the value of any    items as determined by an appraiser should be deducted from

the amount of this judgment as an offset to the judgment.

**B.      The Plaintiff's Section 727 Denial of Discharge Claims**

11 U.S.C. § 727 provides that a debtor shall receive a discharge of all his debts, except in certain limited circumstances. The Plaintiff asserts that several of those exceptions to the right of discharge apply to the Debtor. A plaintiff must prove the elements of 11 U.S.C. § 727(a) by a preponderance of the evidence, and courts generally construe section 727(a) liberally in favor of the debtor. *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir. 2000); *see also, Roberts v. Oliver (In re Oliver)*, 414 B.R. 361, 373 (Bankr. E.D. Tenn. 2009). The Minors have alleged four grounds for denial of the Debtor's discharge. The court will discuss each ground separately below.

**1.      Section 727(a)(2)**

11 U.S.C. § 727(a)(2)(A) provides:

(a)    The court shall grant the debtor a discharge unless – . . . (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –
(A) property of the debtor, within one year before the date of the filing of the petition; or
(B) property of the estate, after the date of the filing of the petition; . . .

11 U.S.C. § 727(a)(2).

The transfers of which the Minors complain are the transfers made by the Debtor of the proceeds of their mother's property. All the transfers about which the Minors complain occurred in 2007, and to the extent that assets were sold, the money appears to have been spent for the Debtor's living expenses over the next year. The bankruptcy was filed in 2011. The court finds no proof that any transfers related to the sale of Danka's property occurred within one year of the bankruptcy filing. Although the Minors have alleged that the Debtor disposed of some of their

47

mother's jewelry, the Debtor denied that he disposed of any jewelry and testified that he was

holding that jewelry for the Minors. D. Lazarevic Test., November 7, 2012. The Plaintiff testified

about approximately a dozen pieces that were missing from the items contained in the

photographs presented by the Debtor. Z. Adamovic Testimony, Rebuttal, November 8, 2012. He

did not offer any evidence of when those pieces were missing or whether his former wife or the

Debtor had disposed of them. *Id.* The Minors have failed to prove by a preponderance of the

evidence that the Debtor received assets for property he converted within the year before filing

which he later transferred. The court finds that there is not sufficient evidence to support a denial

of the discharge based on 11 U.S.C. § 727(a)(2)(A).

### 2.    Section 727(a)(3)

11 U.S.C. § 727(a)(3) precludes a discharge if:

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or
> preserve any recorded information, including books, documents, records, and
> papers, from which the debtor's financial condition or business transactions might
> be ascertained, unless such act or failure to act was justified under all of the
> circumstances of the case.

11 U.S.C. § 727(a)(3).

Although exceptions to discharge are narrowly construed in the debtor's favor, "'[b]road

discretion is vested in the referee to grant or deny a bankruptcy petition based on a determination

that books or records are adequate under the terms of the statute and the facts of each case . . . .'"

*Dolin v. Northern Petrochemical Co. (In re Dolin)*, 799 F.2d 251, 253 (6th Cir. 1986) (quoting

*McBee v. Sliman*, 512 F.2d 504, 506 (5th Cir. 1975)); *see also In re Trantham*, 304 B.R. at 306;

*CM Temporary Servs., Inc. v. Bailey (In re Bailey)*, 375 B.R. 410, 415 (Bankr. S.D. Ohio 2007)

("statute is to be liberally construed in favor of the Debtor").

48

Courts in this Circuit have interpreted 11 U.S.C. § 727(a)(3) "to apply a shifting burden of proof":

> The Plaintiff must establish a *prima facie* case showing the Debtor failed to keep adequate records. For purposes of § 727(a)(3), the Plaintiff is not entitled to perfect, or even necessarily complete, records. Instead, the Debtor must provide the Plaintiff "with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." In determining the adequacy of records, the court can consider the Debtor's education, business experience, sophistication, or any other relevant factor.
>
> If the Plaintiff has established this *prima facie* case, the burden then shifts to the Debtor to explain why the failure to keep records, under the circumstances of the case, is justified. In considering an explanation, the court should consider both the Debtor's credibility and the reasonableness of the explanation, considering the debtor's sophistication and the materiality of the records. The requirement for keeping recorded information is not an unqualified one and complete disclosure is not always required, but instead it is a question of reasonableness under the circumstances. However, if disclosure cannot be made without the keeping of recorded information, the failure to supply the records is relevant to the policy underlying § 727(a)(3).
>
> The ultimate burden of persuasion, of course, rests with the Plaintiff. The standard of proof for discharge objections under § 727(a) is by a preponderance of the evidence.

*CM Temporary Servs., Inc. v. Bailey (In re Bailey)*, 375 B.R. 410, 415-16 (Bankr. S.D. Ohio 2007) (quoting *Turoczy Bonding Co. v. Strbac (In re Strbac)*, 235 B.R. 880, 882 (B.A.P. 6th Cir. 1999)) (other citations omitted). In addition, "'[t]he adequacy of debtor's records must be determined on a case by case basis. Considerations to make this determination include debtor's occupation, financial structure, education, experience, sophistication and any other circumstances that should be considered in the interest of justice.'" *In re Strbac*, 235 B.R. at 882 (quoting *United States v. Trogdon (In re Trogdon)*, 111 B.R. 655, 658 (Bankr. N.D. Ohio 1990)). Further, "intent is not an element under § 727(a)(3)." *See Hendon v. Lufkin (In re Lufkin)*, 393

49

B.R. 585, 593 (Bankr. E.D. Tenn. 2008). Bankruptcy courts in this Circuit have created a standard for assessing that adequacy of recordkeeping that recommends that "the Debtor's records should be measured 'against the type of books and records kept by a reasonably prudent debtor with the same occupation, financial structure, education, and experience.'" *Ayers v. Babb (In re Babb)*, 358 B.R. 343, 354 (Bankr. E.D. Tenn. 2006) (quoting *Wazeter v. Michigan Nat'l Bank (In re Wazeter)*, 209 B.R. 222, 227 (W.D. Mich. 1997) (internal quotation omitted)).

The Debtor has a high school education which focused on a trade. Despite having no formal business or real estate education, he was transacting a real estate business in 2006 and 2007 which involved hundreds of thousands of dollars. He testified that he had a certified public accountant to help him with his taxes. D. Lazarevic Test., November 6, 2012. He employed numerous title companies he had so many transactions. D. Lazarevic Test., November 6, 2012. Nevertheless, he used cash for many of his transactions. *See e.g.* D. Lazarevic Test., November 6, 2012. He kept no records to account for the funds he used to maintain the Payne Road Residence or the improvements he made to six houses he bought and sold in 2007. *See* Trial Ex. 7.

He also seemed to have a problem with accuracy as evidenced by loan applications containing gross errors with respect to his income. Trial Ex. 98 (income reflected as being between $20,000 to $30,000 a month). He failed to include the Payne Road transaction on his tax return. During this time period, he was presenting financial statements to lenders that showed his income as being between $20,000 and $30,000 a month. Trial Ex. 98. At trial, the Debtor explained that the number was a mistake. The court notes it was a mistake he made numerous times. *Id.*

50

The problem with the Minors' objection is that the records they claim are missing relate to loans the Debtor made to his sister or money he spent on the Residence or houses he sold in 2007. The court finds that there were sufficient records for the court to determine how the Debtor disposed of those assets. The court also finds that he provided sufficient information and records to account for proceeds of the property he sold or the location of the property he took.

The only other gap in the Debtor's records noted by the Minors involves the basis of the improvements he made to the houses he flipped in 2007, more than four years ago. The Minors did not address any more recent operations of the Debtor except in the context of the Collins partnership which the court will address in its discussion of false oath. For these reasons, the court will overrule the objection to the Debtor's discharge based on Section 727(a)(3).

### 3.    Section 727(a)(4)(A)

The Bankruptcy Code provides that a debtor shall receive a discharge from the court unless "the debtor knowingly and fraudulently, in or in connection with the case – (A) made a false oath or account; . . ." 11 U.S.C. § 727(a)(4)(A). Courts in this Circuit have determined that to state a claim pursuant to § 727(a)(4)(A), a plaintiff must demonstrate by a preponderance of the evidence the following five elements:

> (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) that the statement related materially to the bankruptcy case.

*Clippard v. Jarrett (In re Jarrett)*, 417 B.R. 896, 903 (Bankr. W.D. Tenn. 2009) (citing *In re Keeney*, 227 F.3d at 685).

Statements made by a debtor in his bankruptcy schedules, his personal statement of financial affairs, and at 341 meetings are all statements made under oath. *In re Johnson*, 387

51

B.R. at 743 (citing *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 725 (B.A.P. 6th Cir. 1999))

(other citations omitted). Whether a false statement under oath has been made pursuant to 11

U.S.C. § 727(a)(4)(A) is a question of fact. *In re Jarrett*, 417 B.R. at 903.

      The Minors contend that in the SOFA the Debtor failed to disclose a partnership with

David Collins, and that he continues to conceal that partnership by denying its existence.

Question 18a. of the SOFA asks an individual debtor to:

> list the names, addresses, taxpayer identification numbers, nature of the businesses, and
> beginning and ending dates of ***all businesses*** in which the ***debtor was*** an officer, director,
> partner, or managing executive of a corporation, ***partner in a partnership, sole
> proprietor, or was self-employed in a trade, profession, or other activity*** either full- or
> part-time ***within six years*** immediately preceding the commencement of this case, or in
> which the debtor owned 5 percent or more of the voting equity securities within six years
> immediately preceding the commencement of this case.

The Debtor's response was "none." Trial Ex. 5, SOFA, Question 18a (emphasis added). The

court finds this statement to be false based on the following evidence.

      The Debtor's 2007 tax return lists rental properties and a plumbing business referred to as

Lazarevic Enterprises . Trial Ex. 7. The response is also false with respect to his dealings with

Mr. Collins. First, Mr. Collins was involved in the sales of four flipped houses in 2007. With

respect to one of the properties located at 1309 Adona Lane, Chattanooga, Tennessee, the Debtor

signed a purchase agreement for the purchase of the property in February of 2007 for $80,000.

D. Lazarevic Test., Nov. 6, 2012, Trial Ex. 100. The Debtor obtained funds from Mr. Collins and

his company Extreme Motors, Inc. to purchase the properties. At approximately the same time,

the Debtor entered into a purchase agreement for the purchase of 1311 Adona Lane for $80,000.

*Id*. Mr. Collins sent a wire for $60,000 and Extreme Motors sent two wires totaling $85,000 to

the Debtor's account at SunTrust Bank in March of 2007. Trial Ex. 100. The purchase of 1309

closed on March 20, and 1311 closed on March 26, 2007.

The Debtor executed a purchase agreement to sell 1309 two weeks later on April 4, 2007 to Mojo and Vedrana Kojic for $113,000. The Debtor executed a purchase agreement for 1311 with Hasan Dukic and Sanela Dukic also on April 4, 2007 for $113,000. Trial Ex. 100. The 1311 sale closed on April 27, 2007. Proceeds of $98,706.76 were distributed to the Debtor and deposited into account no. 2002 of the Debtor's at SunTrust Bank. The 1309 sale closed on May 4, 2007 and the Debtor received $98,677.00 which he deposited into an account at Suntrust Bank, no. 2221. From account no. 2002, he wired $60,000 on May 5, 2004 to Extreme Motors, Inc. referencing "3611 Adona Lane." Trial Ex. 100. There was no evidence that the Debtor ever owned a property at 3611, and the Debtor testified that this wire was a repayment for the Adona Lane purchases. D. Lazarevic Test., Nov. 6, 2007. From account no. 2221, he wired $85,000 to Extreme Motors. On May 20, 2007, he wrote two checks to Mr. Collins, one for $7500 referencing 1309 Adona Ln. and $6500 referencing "1311". *Id.* The Debtor testified these payments were "the cost of [the Debtor's] borrowing money from him." D. Lazarevic Test., Nov. 6, 2011. He admitted that there was no loan agreement. *Id.* He then stated that the $6500 and $7500 were additional money from Mr. Collins to "purchase the complete property." Although he was unable to state exactly where that additional funding was deposited, he stated that it was in one of his bank accounts. *Id.* The court does not find this second explanation credible.

This type of transaction was repeated approximately a month later for two additional properties -6213 and 6215 Bonny Oaks. Trial Ex. 101. The Debtor signed a purchase agreement on April 30, 2007 to acquire 6213 for $70,000. A second purchase agreement was executed by the Debtor for 6215 for $70,000 that same day. Mr. Collins and Extreme Motors provided the

funding to the Debtor through two wire transfers of $76,000 and $64,000 referencing "3613 3615 Bonny Oak Street" and "3613 and 3615 Donny [sic] Oaks Deposit" respectively. The wires were deposited into account no. 2002. Trial Ex. 101. Both properties were acquired on or about May 30, 2007. Approximately a week later, the Debtor entered into a purchase agreement with Peter Mantekas of New York to sell him the properties for $115,000 each. *Id.* The Debtor received $111,047.49 from the sale of 6215. Trial Ex. 101. Presumably he received the same amount from the closing of 6213 since Trial Exhibit 101 demonstrates that he deposited $207,094.38 of the proceeds into a new Suntrust Bank account, no. 1744 on June 26, 2007, and $15,000 into account 2002 from the sale of these two properties. The Debtor wired $76,000 on June 27, 2007 to Extreme Motors and $64,000 on June 28, 2007 to Extreme Motors from account no. 1744. On July 6, the Debtor wired an additional $16,000 to Mr. Collins. *Id.* There is no note or credit agreement evidencing this transaction.

Mr. Collins is never identified as a partner in the exhibits provided by the Minors, except in one note written by a closing agent. Trial Ex. 103. Nevertheless it appears that Mr. Collins and the Debtor were engaged in transactions for profit in which they were sharing profits. "In Tennessee, a partnership is defined as an association of two or more persons to carry on as co-owners a business for profit, T.C.A. § 61-1-105(a), and the receipt of a share of the profits of that business is prima facie evidence that a partnership exists, T.C.A. § 61-1-106(4)." *Bass v. Bass*, 814 S.W.2d 38, 41 (Tenn Sup. Ct. 1991). "[T]he existence of a partnership may be implied from the circumstances where it appears that the individuals involved have entered into a business relationship for profit, combining their property, labor, skill, experience, or money." *Id.* The court finds that in these four property transactions the Debtor and Mr. Collins had a

partnership. There are other transactions with Mr. Collins that support a finding that the Debtor

was engaged in other undisclosed businesses whether it was as a partner or as an individual.

Either way, Question 18 required disclosure of the existence of these businesses. Mr. Collins was

clearly involved in the sale of Danka's residence. He signed the contract which reflected an

agreement to pay $29,900. Trial Ex. 25. He signed the HUD statement indicating that the

$29,900 had in fact been paid, when it had not. If that HUD statement is false, then Mr. Collins

was colluding with the Debtor to maximize the loan value on the property. If the HUD statement

is true, then Debtor has testified falsely at the trial about the downpayment not being made.

Whichever version of the transaction the court considers, the eligibility of the Debtor for a

discharge is called into question.

   The Debtor also testified that he negotiated the purchase of the sale of five properties for

Mr. Collins in 2005. D. Lazarevic Test., November 6, 2011. When the purchase contracts were

signed the Debtor was shown as one of the purchasers. Three of the properties were financed by

Wells Fargo Bank, N.A., who insisted that all of the parties shown on the purchase contract sign

the deed of trust according to the Debtor. The lenders on the other two properties allowed only

Mr. Collins to sign loan documents. As for the three Wells Fargo properties, the Debtor testified

that he quitclaimed his interest in the properties to Mr. Collins. "Later in time, eight, nine

months, maybe a year, I'm not exactly sure, I had a withdrawal from that title, quitclaimed it

back to him." D. Lazarevic Test., Nov. 6, 2011. However, the deed of trust on the property

located at 1823 Jenkins Road still shows the Debtor as a co-obligor. Trial Ex. 51. Wells Fargo

has filed a claim attaching the deed of trust dated May 6, 2005 signed by the Debtor, his wife,

and Mr. Collins. Claims Register, Claim No.2. Trial Ex 51.

The trial exhibits show that the Debtor and Mr. Collins did, in fact, take title jointly to property located at 1815 Jenkins Road on May 5, 2005 (Trial Ex. 44, Warranty Deed), 1823 Jenkins Road on May 6, 2005 (Trial Ex. 45), 1819 Jenkins Road on May 25, 2005 (Trial Ex. 46) and Lot 2, Final Platt Hockett on Jenkins Road Subdivision on May 25, 2005 (Trial Ex. 47). On May 6, Mr. Collins, the Debtor and his wife signed the deed of trust pledging 1823 Jenkins Road to Wells Fargo Bank, N.A. Trial Ex. 51. They signed a deed of trust pledging 1815 Jenkins Road on May 6, 2005. Trial Ex. 52. Finally on May 23, Mr. Collins and only the Debtor signed a deed of trust pledging 1819 Jenkins Road. Trial Ex. 53. No deeds were provided which showed when the Debtor actually quitclaimed the properties back to Mr. Collins.

The Debtor negotiated the purchase of the property on which Chattanooga Motors, the Debtor's employer, is located in Chattanooga at 6870 and 6880 Lee Highway. Trial Ex. 103. The purchase agreement was originally in the name of the Debtor, and the Debtor provided the down payment. *Id*. D. Lazarevic Test., Nov. 6, 2012. Mr. Collins was named as the purchaser on the deed and signed the closing statement in June of 2007. D. Lazarevic Test., Nov. 6, 2012; Trial Ex. 103.The Debtor testified he was reimbursed for the downpayment by Mr. Collins, although the closing statement does not reflect any distribution to the Debtor. D. Lazarevic Test., Nov. 6, 2012.

The Debtor has recently been a manager of Jenkins Road properties owned by Mr. Collins. Donna testified at trial that after her divorce in late 2007, the Debtor helped her with a place to live. She testified that he managed houses on Jenkins Road and that he paid her rent on 1823 Jenkins Road. Mr. Collins was her landlord. She testified that she did not know whether he was managing the property currently because she moved out about a year and a half before the

56

trial. Do. Lazarevic Test., November 7, 2012. Her rental house was the same property on which

the Debtor remains obligated on the deed of trust. Based on her testimony, the court concludes

that the Debtor was managing property for Mr. Collins as late as her move out date, eighteen

months before the trial. That date would have been May of 2011, a date three months after the

Debtor filed his bankruptcy case. There is no disclosure of either a full or part time property

management business in response to Question 18.

Having found that the Debtor's statement that he had no other businesses or partnerships

was a false statement made in his SOFA under oath, the court must determine if that false

statement was intentional. *In re Flemings*, 433 B.R. at 236. With respect to this issue, a finding

of fraudulent intent "is a question of fact that is highly dependent on the bankruptcy court's

assessment of the debtor's credibility." *Roberts v. Debusk (In re Debusk)*, No. 3:08-cv-427, 2009

WL 1256891, at *4 (E.D. Tenn. May 1, 2009).

The court does not find credible the Debtor's testimony that he has no relationship with

Mr. Collins other than as a lender. He admits that they were childhood friends. He admits the

HUD statement regarding the downpayment for the residence was false. He first explained the

transactions with Mr. Collins as being merely loans but there is no documentation to evidence a

lending relationship. He then explained that Mr. Collins had provided all of the money for the

four purchases in 2007 but could not specify where he had deposited that money. He signed a

deed of trust obligating himself for the payment of debt on the Jenkins Road property which he

arranged for his sister to live in rent free. He failed to disclose his ongoing relationship managing

properties in which Mr. Collins has an interest.

An inference of deceitful intent may be found where the evidence demonstrates that a

57

series or pattern of errors occurred. *See General Motors Co. v. Heraud (In re Heraud)*, 410 B.R. 569, 581 (Bankr. E.D. Mich. 2009). The court finds a pattern of mistakes and inaccuracies in financial statements and tax returns related to transactions involving the Debtor and Mr. Collins. The HUD statement, the Residence Sale Contract, the Jenkins Road deed and deed of trust, and his 2007 tax return omitting the Residence proceeds are all written documents which contain incorrect information according to the Debtor's testimony at trial. It appears that there is very little accurate or documented where Mr. Collins is involved.

If the plaintiff "meets his burden of proof on the issue of intent, the burden shifts to the debtor to rebut the presumption." *In re Flemings*, 433 B.R. at 240.The Debtor's rebuttal is that he was only a borrower from Mr. Collins and that they were never partners. The court finds that the Debtor has not satisfactorily explained his relationship with Mr. Collins through his testimony or written documentation. Even if the court believed that the Debtor acted as a sole proprietor in a business in which he was an agent for Mr. Collins, his failure to list that business or his interest in the rental units and business real estate reflected on his tax returns is an intentional misrepresentation regarding his businesses during the six years prior to the commencement of his case.

The last determination for the court is whether this false statement was material. The court finds that the omission of any reference to Mr. Collins, the Debtor's transactions with Mr. Collins or his real estate business in general was material. Disclosing those relationships with Mr. Collins would have brought the questions about $29,900 receivable for the Residence to light or generated further inquiry into his real estate business, gifts of rent to his sister, and the disposition of the rental properties listed on the tax returns. Had the real estate business been

58

disclosed, the trustee might have sought to recover the missing down payment from Mr. Collins.

The court finds that false oaths were made with fraudulent intent and related to facts material to

the bankruptcy.

In *In re Hamo*, the Bankruptcy Appellate Panel for the Sixth Circuit quoted a bankruptcy

court regarding the purpose of § 727(a)(4)(A):

> The very purpose of . . . 11 U.S.C. § 727(a)(4)(A), is to make certain that those
> who seek the shelter of the bankruptcy code do not play fast and loose with their
> assets or with the reality of their affairs. The statutes are designed to insure that
> complete, truthful, and reliable information is put forward at the outset of the
> proceedings, so that decisions can be made by the parties in interest based on fact
> rather than fiction . . . . Neither the trustee nor the creditors should be required to
> engage in a laborious tug-of-war to drag the simple truth into the glare of
> daylight.
> . . . .
> A discharge is a privilege and not a right and therefore the strict requirement of
> accuracy is a small quid pro quo. The successful functioning of the bankruptcy
> code hinges upon the bankrupt's veracity and his willingness to make a full
> disclosure.

233 B.R. at 725-726 (quoting *Hillis v. Martin, Martin v. Martin (In re Martin)*, 124 B.R. 542,

545, 547-48 (Bankr. N.D. Ind. 1991)).

The Sixth Circuit explained in *In re Keeney* how courts should analyze section

727(a)(4)(A) claims:

> " 'Complete financial disclosure' " is a prerequisite to the privilege of discharge.
> The Court of Appeals for the Seventh Circuit has explained that intent to defraud
> "involves a material representation that you know to be false, or, what amounts to
> the same thing, an omission that you know will create an erroneous impression."
> A reckless disregard as to whether a representation is true will also satisfy the
> intent requirement. " '[C]ourts may deduce fraudulent intent from all the facts and
> circumstances of a case.' " However, a debtor is entitled to discharge if false
> information is the result of mistake or inadvertence. The subject of a false oath is
> material if it " 'bears a relationship to the bankrupt's business transactions or
> estate, or concerns the discovery of assets, business dealings, or the existence and
> disposition of his property.' "

227 F.3d at 685-86 (citing *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998)) (quoting *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir. 1987); *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992)).

In addition, in response to Question 14 which asks the Debtor to list all property owned by another that the Debtor holds or controls, he responded "none." Trial Ex. 5, SOFA, Question 14. At trial, he testified that he was holding approximately 120 pieces of Danka's jewelry for the Minors. D. Lazarevic Test., November 7, 2012. He lists his jewelry on Schedule B- Personal Property to include wedding bands valued at $100 and other jewelry worth $60.00. Trial Ex. 5, Schedule B. Given the level of animosity demonstrated at trial between the Debtor and the Minors, the court also finds that the failure to disclose the existence of the jewelry was a knowingly false statement. The jewelry should have been disclosed on Schedule B as his own since he took possession of it after claiming to have determined it was abandoned, or at a minimum, in response to the question about property held for another. The court finds that the failure to disclose was done with the intent to avoid scrutiny of the transactions that involved property obtained from his sister. The court finds that the Debtor has played fast and loose with his assets and the reality of his affairs for the six year period prior to the filing. The Plaintiff has met his burden of proof on this claim, and the court will deny Debtor's discharge based on Section 727(a)(4)(A).

### 4.    Section 727(a)(5)

Section 727(a)(5) allows a court to deny a discharge where "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). With

60

respect to a Section 727(a)(5) claim:

> [t]he initial burden is on the Plaintiff to establish the loss or deficiency of assets by demonstrating that (1) at a time not too remote from the bankruptcy, the Defendant owned identifiable assets; (2) on the day that he commenced his bankruptcy case, the Defendant no longer owned the particular assets in question; and (3) his schedules and/or the pleadings in the bankruptcy case do not offer an adequate explanation for the disposition of the assets in question. The Plaintiff is not required to prove that the Defendant acted knowingly or fraudulently, as "noticeably lacking from § 727(a)(5) is any element of wrongful intent or, for that matter, any affirmative defenses-- § 727(a)(5) simply imposes strict liability."

*Roberts v. Debusk (In re Debusk)*, No. 08-3015, 2008 WL 3904448, at *8 (Bankr. E.D. Tenn.

Aug. 19, 2008) (citing *Schilling v. O'Bryan (In re O'Bryan)*, 246 B.R. 271, 279 (Bankr. W.D.

Ky. 1999) and quoting *Baker v. Reed (In re Reed)*, 310 B.R. 363, 368 (Bankr. N.D. Ohio 2004)).

The court finds that the Minors have not sustained their burden of showing that the

Debtor previously owned specific assets, which he no longer has and for which he has not given

an adequate explanation. The Debtor has explained the missing down payment from the

Residence and the income numbers on his financial statements by claiming that those assets

never existed. The Debtor has explained the loss of assets relied upon by the Plaintiff to object to

the discharge by admitting that he previously misrepresented his income and the receipt of the

down payment on the Residence. The court finds that the statements made in the financial

statements were in fact false, and that the Debtor was not receiving $20,000 to $30,000 a month

as income, the loss of which he has failed to explain. With respect to Danka's property which he

took, the court finds that he either still has the property or he has explained how he spent it.

Although this is an unusual defense to this objection and may have adverse implications for the

Debtor in other actions, the court does not find that the Debtor has failed to satisfactorily explain

the loss of assets identified as missing by the Plaintiff.

61

### C.    Punitive Damages

The Plaintiff also seeks punitive damages. Tennessee courts maintain that "an award of punitive damages is limited to 'the most egregious cases' and is proper only where there is clear and convincing proof that the defendant has acted either 'intentionally, fraudulently, maliciously, or recklessly.'" *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 211 n. 14 (Tenn. Sup. Ct. 2012) (citing *Goff v. Elmo Greer & Sons Constr. Co.*, 297 S.W.3d 175, 187 (Tenn. Sup. Ct. 2009) and *Hodges v. S.C. Toof & Co.*, 833 S.W. 2d 896, 901 (Tenn. Sup. Ct. 1992)). Punitive damages "are intended to 'punish a defendant, to deter him from committing acts of a similar nature, and to make a public example of him.'" *Goff*, 297 S.W.3d at 187. A bankruptcy court may award punitive damages for a Section 523(a)(6) claim if it finds that the standard for punitive damages under state law has been met. *See e.g. In re Hall*, No. 12-3026, 2013 WL 1739658, at *2-5 (Bankr. E.D. Tenn. Apr. 23, 2013).

With respect to this case, the court concludes that the Debtor inflicted willful and malicious injury to the Minors. Nevertheless, the court finds that punitive damages are not warranted to prevent the Debtor from taking similar actions. As to the specific debts owed to the Minors, it is unlikely that the Debtor will repeat this conduct. There are no other assets of which the court is aware that will be within the Debtor's control due to the administration of the decedent's estate. This case is in large part a family dispute in which a personal tragedy, poor planning, and tough economic times have exacerbated the hard feelings between the litigants. This is not a case that demands a public example to stop others.

### D.    Attorneys' Fees

The Plaintiff has also requested attorneys' fees. Attorneys' fees are available under

Tennessee law that provides that "[i]n a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party from the trust that is the subject of the controversy." Tenn. Code Ann. § 35-15-1004(a). However, the court has found that the Plaintiff has not met his high burden of proof regarding proving the existence of an oral trust.

In *Cohen v. de la Cruz*, the U.S. Supreme Court held that attorneys' fees and treble damages could be awarded in a Section 523 nondischargeability claim, if such damages were supported by an underlying state law. 523 U.S. 213, 223, 118 S.Ct. 1212, 1219 (1998). However, as one bankruptcy court explained, "it is clear that *Cohen* itself does not create an independent right to attorney's fees for the benefit of a party who prevails in a Section 523 dischargeability proceeding. Instead, it clarifies that attorney's fees supported by statute are included in the debt that may be determined to be non-dischargeable." *Headrick v. Atchison (In re Atchison)*, 255 B.R. 790, 793 (Bankr. M.D. Fla. 2000) (citing *Cohen*, 523 U.S. 213). Thus, the Plaintiff is not entitled to attorneys' fees merely because of his success on his nondischargeability claim. Further, the court cannot find another basis upon which to award the Plaintiff attorneys' fees.

In the absence of a statutory or contractual right to attorneys' fees, Tennessee law follows the American rule pertaining to the award of attorneys' fees with only a few limited exceptions to that rule. *See Pullman Standard, Inc. v. Abex Corporation*, 693 S.W.2d 336 (Tenn. Sup. Ct. 1985). In *Pullman* the Tennessee Supreme Court noted that "[w]e continue to adhere to the rule in Tennessee that attorneys' fees are not recoverable in the absence of a statute or contract specifically providing for such recovery, or a recognized ground of equity; . . ." *Id.* at 338. The

63

Court also noted two exceptions to this general rule, the indemnity rule and the independent tort rule. With respect to the indemnity rule, the court held "that the right of indemnity which arises by operation of law, based upon the relationship of the parties . . . includes the right to recover attorneys' fees and other litigation costs which have been incurred by the indemnitee in litigation with a third party." *Id.* The Court also adopted the independent tort theory exception, explained in the following way: " '. . . where the natural and proximate consequence of a tortious act of defendant has been to involve plaintiff in litigation with a third person, reasonable compensation for attorneys' fees incurred by plaintiff in such action may be recovered as damages against the author of the tortious act.'" *Id.* at 340 (quoting 42 A.L.R.2d 1183 (1956)). The Minors have offered no proof that they have incurred legal expenses in litigation with a third person as a result of the Debtor's actions. Therefore, the court concludes that there is no separate underlying right under Tennessee law for attorneys' fees related to the Plaintiff's Section 523(a)(6) claim or his Section 727 discharge claims. Plaintiff's request for attorneys' fees will be DENIED.

## V.    Conclusion

For the reasons explained *supra*, the court concludes:

(1) the Debtor did not obtain property from his sister by fraud or false pretenses;

(2) there was not clear and convincing evidence that Danka established a trust for the Minors' benefit into which she placed her Residence;

(3) other than the Residence, Danka conveyed no other personal property to her brother; and

(4) the Debtor did willfully and maliciously convert $51,075 worth of personal property to his own use that would otherwise have been inherited by the Minors.

64

The court will grant a judgment in favor of the Minors in the amount of $51,075 compensatory damages for debts which arose from willful and malicious injury caused by the Debtor's conversion of Danka's property. To the extent the Minors receive any specific items of jewelry from the administration of Danka's estate, the value of any such jewelry items may be deducted from the amount of this judgment as an offset to the judgment. The court will not award the Plaintiff punitive damages or attorneys' fees.

The court further finds that the Debtor knowingly made false oaths with respect to his operations of businesses and his relationship with David Collins. For that reason, the objection to the Debtor's discharge is sustained. With respect to the remaining objections pursuant to 11 U.S.C. § 727, the court finds that the Minors have not carried their burden of proof.

A separate order will enter.

# # #